**KANEKA CORPORATION**

v.

**SKC KOLON PI, INC. et al.**

**Case No. CV 11-3397 JGB (RZx)**

United States District Court, C.D. California.

Signed 08/02/2016

Anthony J. Dain, Dave Deonarine, Frederick K. Taylor, J Christopher Jaczko, Nikki Ma, Raymond K. Chan, Procopio Cory Hargreaves and Savitch LLP, San Diego, CA, for Kaneka Corporation.

John Williamson, Anthony A. Hartmann, Cecilia Sanabria, Daniel G. Chung, Eric J.

Fues, Hala S. Mourad, Mindy L. Ehren-fried, Parmanand K. Sharma, Richard L. Stroup, Smith R. Brittingham, IV, Finnegan Henderson Farabow Garrett and Dunner LLP, Washington, DC, Charles Hyuk Suh, Minjae Kang, Finnegan Henderson Farabow Garrett & Dunner LLP, Reston, VA, David Karl Willingham, Caldwell Leslie and Proctor PC, Los Angeles, CA, for SKC Kolon PI, Inc. et al.

Proceedings: Order: (1) DENYING Defendants' Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial on Induced Infringement, (Doc. No. 692); (2) FINDING the Equitable Defenses of Implied License and Laches Do Not Bar Plaintiff's Claims, (Doc. Nos. 654, 698); and (3) GRANTING IN PART Plaintiff's Motion for Entry of Judgment, an Award of Supplemental Damages, an Accounting of Infringing Sales, and Pre-Judgment and Post-Judgment Interest, (Doc. No. 669) (IN CHAMBERS)

JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

Before the Court are two post-trial motions: Plaintiff's Motion for Entry of Judgment, an Award of Supplemental Damages, an Accounting of Infringing Sales, and Pre– and Post-Judgment Interest, ("Plaintiff's Motion," Doc. No. 669), and Defendants' Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial on Induced Infringement, ("Defendants' Motion," Doc. No. 692). Also before the Court is the issue of whether Defendants' equitable defenses of implied license and laches bar Plaintiff's claims. (Doc. Nos. 654, 698.) For the following reasons, the Court GRANTS IN PART Plaintiff's Motion, DENIES Defendants' Motion, and FINDS that the equitable defenses asserted by Defendants do not bar Plaintiff's claims.

## I. BACKGROUND

### A. Procedural Posture

On July 26, 2010, Plaintiff Kaneka Corporation ("Kaneka" or "Plaintiff"), a Japanese corporation, filed this patent-infringement action against Defendants SKC Kolon PI, Inc. ("SKPI"), a Korean corporation, and SKC, Inc. ("SKC"), a U.S. corporation (collectively, "Defendants"). (Complaint, Doc. No. 1.) Kaneka and SKPI both manufacture and sell polyimide films. (Second Amended Complaint ("SAC"), Doc. No. 230, ¶ 17.) These films can be made into flexible copper-clad laminates, which are then made into flexible printed circuit boards. (Id. ¶ 28.) The patents asserted in this case include claims covering polyimide films, as well as methods and processes for producing the films.[1] (Id. ¶ 16.)

After a transfer of venue, a lengthy stay during an International Trade Commission ("ITC") investigation, several amendments to the Complaint, and a comprehensive Markman hearing, the parties filed cross-motions for summary judgment on June 30, 2014. (Doc. Nos. 448, 452.) On April 10, 2015, the Court issued its ruling on the motions for summary judgment, granting in part and denying in part each of the motions. ("MSJ Order," Doc. No. 513.)

---

1. Although the Complaint alleged violations of five patents, the parties stipulated to dismissal of two, (Doc. No. 408), and the Court stayed the action as to one, pending an appeal to the Federal Circuit, (Doc. No. 486). Therefore, the only two patents remaining are U.S. Patent Nos. 5,075,064 ("the '064 Patent") and 7,691,961 ("the '961 Patent"). The '064 Patent, which issued on December 24, 1991, is entitled "Method and Apparatus for Continuously Producing Resin Films and Installation Therefore." (SAC ¶ 47.) The '961 Patent, which issued on April 6, 2010, covers a specific polyimide film, and is entitled "Polyimide Film and Use Thereof." (Id. ¶ 40.)

The case proceeded to a jury trial, which commenced on November 3, 2015 and concluded on November 19, 2015. (Minutes of Jury Trial for Nov. 3 & 9, 2015, Doc. Nos. 658, 668.) At the close of Plaintiff's case in chief, Defendants made a motion for judgment as a matter of law. (Doc. No. 644.) The Court denied the motion. (Minutes of Jury Trial for Nov. 16, 2015, Doc. No. 665.) At the close of Defendants' case, Plaintiff made a motion for judgment as a matter of law, (Doc. No. 651), and Defendants renewed their motion, adding additional arguments, (Doc. No. 652). The Court denied both motions. (Minutes of Jury Trial for Nov. 18, 2015, Doc. No. 723; Trial Transcript, Nov. 18, 2015, a.m.) On November 18, 2015, the jury was instructed, and, after hearing closing arguments, retired to deliberate. (Minutes of Jury Trial for Nov. 18, 2015, Doc. No. 667.)

## B. The Verdict

On November 19, 2015, the jury returned a unanimous verdict in favor of Plaintiff. (See Minutes of Jury Trial for Nov. 19, 2015, Doc. No. 668; Verdict, Doc. No. 656.)

### 1. Direct Infringement by SKC

Regarding Kaneka's direct infringement claims against SKC, the jury found that it is more likely than not that each of the films alleged to infringe Claim 1 of the '064 Patent[2] were made by Kaneka's patented process and that SKC directly infringed Claim 1 of the '064 Patent by importing into the United States, or by offering for sale or selling in the United States, each of those accused films. (Verdict ¶¶ 1, 2, Doc. No. 656.) The jury also found that it is more likely than not that the film alleged to infringe Claims 9 and 10 of the '961 Patent[3] was made by Kaneka's patented process and that SKC directly infringed Claims 9 and 10 of the '961 Patent by importing into the United States, or by offering for sale or selling in the United States, the accused SKPI film. (Id. ¶ 3.)

### 2. Induced Infringement by SKPI

As to Kaneka's induced infringement claim against SKPI for the '064 Patent, the jury found that it is more likely than not that SKPI was aware of the '064 Patent before Kaneka filed its Complaint on July 26, 2010, and that the earliest date SKPI was aware of the '064 Patent was August 5, 2004. (Verdict ¶¶ 4, 5.) The jury also found that it is more likely than not that SKC, Samsung, and/or LG directly infringed Claim 1 of the '064 Patent before March 14, 2010 by importing into the United States, or by offering for sale or selling in the United States, the accused SKPI films or mobile phones that incorporated the accused SKPI films made by the patented process. (Id. ¶ 6.) For purposes of Kaneka's claim of induced infringement against SKPI, the jury found that each film accused to infringe Claim 1 of the '064 Patent[4] was made by Kaneka's patented pro-

---

2. For Kaneka's claim of direct infringement against SKC, the films alleged to infringe Claim 1 of the '064 Patent are: IF70 12.5 μm; IF70 25 μm; IN30 75 μm (a/k/a LH 75); IN70 19 μm (a/k/a LV70 19 μm, LV 19 μm, LV75 19 μm); IN70 25 μm (a/k/a LV70 25 μm, LV 25 μm, LV100 25 μm); and IN70 50 μm (a/k/a LV70 μm, LV 50 μm, LV 200 50 μm). (Verdict ¶ 2, Doc. No. 656.)

3. For Kaneka's claim of direct infringement against SKC, the film alleged to infringe Claims 9 and 10 of the '961 Patent is LV100

25 μm (a/k/a LV70 25 μm, LV 25 μm, IN70 25 μm). (Verdict ¶ 3.)

4. For Kaneka's induced infringement claim against SKPI, the films alleged to infringe Claim 1 of the '064 Patent are: GL70 25 μm; IF70 10 μm; IF70 12.5 μm; IF70 25 μm; IF70 50 μm; IF70 75 μm; IN30 50 μm (a/k/a LH 50 μm); IN30 75 μm (a/k/a LH 75 μm); IN70 19 μm (a/k/a LV70 19 μm; LV 19 μm; LV75 25 μm); IN70 25 μm (a/k/a LV70 25 μm, LV 25 μm, LV100 25 μm); IN70 50 μm (a/k/a LV70 50 μm, LV 50 μm, LV200 50 μm); IN70 75

cess. (Id. ¶ 7.) The jury further found that it is more likely than not that SKPI actively and intentionally induced SKC's, Samsung's, and/or LG's direct infringement of the '064 Patent with knowledge or willful blindness of the patent. (Id. ¶ 8.)

As for the '961 Patent, the jury found that it is more likely than not that SKC, Samsung, and/or LG directly infringed Claims 2, 3, 5, 9, 10, and 12 of the '961 Patent by importing into the United States, or by offering for sale or selling in the United States, the accused SKPI films or mobile phones that incorporated the accused SKPI films that include each limitation of the Claims. (Id. ¶¶ 9, 11.) The jury also found that it is more likely than not that each film accused to infringe Claim 2,[5] Claim 3,[6] Claim 5,[7] Claim 9,[8] and Claim 12 [9] of the '961 Patent infringes the respective claims of the patent. (Verdict ¶¶ 10, 12.) As to Claim 10,[10] the jury found that all but two of the films [11] accused of infringing Claim 10 of the '961 Patent infringe the patent. The jury further found that it is more likely than not that SKPI actively and intentionally induced SKC's, Samsung's, and/or LG's direct infringement of the '961 Patent with knowledge or willful blindness of the patent. (Id. ¶ 13.)

### 3. Defense of Patent Invalidity

As an affirmative defense to Plaintiff's claims, Defendants asserted that both the '064 Patent and the '961 Patent are invalid as anticipated and/or obvious to a person of ordinary skill in the art in view of prior art that was introduced at trial. However, as to each patent, the jury found that Defendants did not prove that it is highly probable that any of the asserted claims of the '064 Patent or '961 Patent are invalid. (Verdict ¶¶ 14, 15.) Defendants also sought to prove that it is highly probably that the '961 Patent does not contain a description of the invention of Claims 2, 3, and 5 that is sufficiently full and clear to enable a person of ordinary skill in the art to make and use the full scope of the claimed invention. The jury found against Defendants as to each Claim on this affirmative defense. (Id. ¶ 16.)

---

μm (a/k/a LV70 75 μm, LV 75 μm, LV300 75 μm); LH 50 μm (a/k/a IN30 50 μm); LH 75 μm (a/k/a IN30 75 μm); LN 12.5 μm; LN 25 μm; LN 50 μm; LN70 12.5 μm; LN70 25 μm; LS 12.5 μm; LS 25 μm; LS 50 μm; LV 25 μm (a/k/a LV70 25 μm; LV100 25 μm; IN70 25 μm); LV 50 μm (a/k/a LV70 50 μm, LV200 50 μm, IN70 50 μm); LV 75 μm (a/k/a LV70 75 μm, LV300 75 μm, IN70 75 μm); LV70 25 μm (a/k/a LV 25 μm, LV100 25 μm, IN70 25 μm); and LV70 50 μm (a/k/a LV 50 μm, LV200 50 μm, IN70 50 μm). (Verdict ¶ 7.)

5. For Kaneka's induced infringement claim against SKPI, the films alleged to infringe Claims 2 and 3 of the '961 Patent are: LN050 12.5 μm; LN100 25 μm; IF70 25 μm; IF70 50 μm; and IF70 75 μm. (Verdict ¶ 10.)

6. See fn. 5.

7. For Kaneka's induced infringement claim against SKPI, the films alleged to infringe Claim 5 of the '961 Patent are: LN050 12.5 μm; LN100 25 μm; IF70 12.5 μm; IF70 25 μm; IF70 50 μm; and IF70 75 μm. (Verdict ¶ 10.)

8. For Kaneka's induced infringement claim against SKPI, the films alleged to infringe Claims 9, 10, and 12 of the '961 Patent are: LN050 12.5 μm; LN100 25 μm; IF70 12.5 μm; IF70 25 μm; IF70 50 μm; IF70 75 μm; LV100 25 μm (a/k/a LV70 25 μm, LV 25 μm, IN70 25 μm); LV200 50 μm (a/k/a LV70 50 μm, LV 50 μm, IN70 50 μm); and LV300 75 μm (a/k/a LV70 75 μm, LV 75 μm, IN70 75 μm). (Verdict ¶ 12.)

9. See fn. 8.

10. See fn. 8.

11. The two films found not to infringe Claim 10 of the '961 Patent are: IF70 (25 ¶m) and IF70 (75 ¶m). (Verdict ¶ 12.) As to IF70 (25 μm), it appears the jury initially checked the box indicating that it did infringe, but subsequently wrote "No" over the check mark. The Court interprets this to mean that the jury changed their mind and ultimately found IF70 (25 μm) does not infringe Claim 10 of the '961 Patent.

## 4. Defense of Patent Exhaustion

Defendants also asserted patent exhaustion as an affirmative defense. Specifically, Defendants introduced evidence at trial that Kaneka granted a Japanese company, Hirano, a license to manufacture and sell polyimide film production equipment— equipment which allegedly practiced the patents-in-suit—and that SKPI and/or its Global Partners (SKC or Kolon) purchased this equipment from Hirano in a sale that was authorized under the license Kaneka granted to Hirano. However, the jury found that Defendants failed to prove it is more likely than not that the sale of polyimide film production equipment was an authorized sale under the license. (Verdict ¶ 17.)

## 5. SKC's Lanham Act Counterclaim

SKC sought to prove that Kaneka acted in bad faith when it sent letters to SKC's existing or potential customers which contained allegedly false or misleading statements regarding this lawsuit and SKC's alleged infringement of Kaneka's patents. However, the jury found that SKC did not prove that it is highly probable that Kaneka acted in bad faith when it sent the letters. (Verdict ¶ 24.)

## 6. Damages

The jury awarded Kaneka $13,488,765.06 in lost profits for sales that it found Kaneka would have made with reasonable probability but for SKPI's infringement of the patents-in-suit. (Verdict ¶¶ 19, 22.) Specifically, the jury awarded Kaneka $5,920,389.50 for lost profits due to SKPI's infringement of the '064 Patent, (id. ¶ 19), and $7,568,375.56 for lost profits due to SKPI's infringement of the '961 Patent, (id. ¶ 22). The jury did not award any royalty to Kaneka for infringing sales by SKPI of either the '064 Patent or the '961 Patent. (Id. ¶¶ 20, 23.) The jury also did not award any royalty to Kaneka for infringing sales by SKC of either the '064

Patent or the '961 Patent. (Verdict ¶¶ 18, 21.)

## C. Post-Trial Motions and Bench Resolution of Equitable Defenses

Following the jury's verdict, on December 17, 2015, Defendants filed a motion for judgment as a matter of law on Kaneka's induced infringement claims, or, in the alternative, for a new trial on those claims. ("Defendants' Motion," Doc. No. 692.) On January 8, 2016, Plaintiff opposed Defendants' Motion. ("Plaintiff's Opposition," Doc. No. 697.) Defendants filed a reply memorandum in support of their motion on January 15, 2016, (Doc. No. 700), which they amended on January 19, 2016 to comply with the Court's page limits, ("Defendants' Reply," Doc. No. 701-1).

On December 10, 2015, Kaneka filed a Motion for Entry of Judgment, an Award of Supplemental Damages, an Accounting of Infringing Sales, and for Pre– and Post-Judgment Interest. ("Plaintiff's Motion," Doc. No. 669.) On December 17, 2015, Defendants filed an opposition to Plaintiff's Motion. ("Defendants' Opposition," Doc. No. 693.) Plaintiff filed a reply memorandum in support of its motion on January 8, 2015. ("Plaintiff's Reply," Doc. No. 696.) On January 15, 2016, Defendants filed an ex parte application for leave to file a surreply in opposition to Plaintiff's Motion, (Doc. No. 699), which the Court granted, (Doc. No. 712). Defendants filed their surreply on January 25, 2016. ("Defendants' Sur-Reply," Doc. No. 714.)

Prior to filing their post-trial motions, on November 17, 2015, Defendants filed a memorandum of proposed findings of fact and conclusions of law in support of their equitable defenses of implied license and laches. (Doc. No. 650.) On November 30, 2015, Defendants filed another brief outlining their arguments in support of their equitable defenses of implied license and

laches. ("Defendants' Equitable Defenses Brief," Doc. No. 654.) Plaintiff filed a corresponding brief in opposition on January 13, 2016. ("Plaintiff's Equitable Defenses Brief," Doc. No. 698.) On January 25, 2016, unsolicited and without leave of Court, Defendants filed yet a third brief on the issue. ("Defendants' Equitable Defenses Reply," Doc. No. 713.)

The Court held hearings on the post-trial motions and Defendants' equitable defenses on February 25, 2016 and March 3, 2016. (Doc. Nos. 719, 721.) On May 26, 2016, the Court held a telephonic status conference with the parties and directed the parties to submit supplemental briefing regarding what evidence, if any, supports the jury's finding that SKPI did not have a good-faith belief of non-infringement of the '961 Patent after the ITC decision issued on May 10, 2012. (Doc. No. 727.) Both parties submitted their supplemental briefs on June 10, 2016. ("Plaintiff's Supp. Br.," Doc. No. 728; "Defendants' Supp. Br.," Doc. No. 729.)

## II. DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW ON INDUCED INFRINGEMENT, OR IN THE ALTERNATIVE, A NEW TRIAL

Defendants move for judgment as a matter of law, or in the alternative, a new trial on Plaintiff's claims of induced infringement of the '064 and '961 Patents. (Defendants' Motion at 1.) Specifically, Defendants argue that the special verdict form did not permit the jury to make the factual findings necessary to support an entry of judgment on induced infringement. (Id. at 2.) Defendants also contend that there is insufficient evidence to support a judgment of induced infringement because: (a) there is no evidence to sup-

port a finding of direct infringement by Samsung or LG; (b) there is no evidence to support a finding that SKPI knew of the '064 Patent prior to the filing of this lawsuit; and (c) there is no evidence to support a finding that SKPI took active steps to intentionally induce known infringement. (Id. at 4-20.) Kaneka opposes, arguing both that the special verdict form contains all the findings necessary to support an entry of judgment on induced infringement and that sufficient evidence supports such findings. (Plaintiff's Opposition at 2-18.)

### A. Legal Standards

#### 1. Judgment as a Matter of Law

Federal Rule of Civil Procedure[12] 50 provides that "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a). If the court does not grant the motion, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). "No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Id. In ruling on the renewed motion, the court may uphold the jury's verdict, order a new trial, or direct entry of judgment as a matter of law. Id.

■ In patent cases, the law of the regional circuit sets the standard applied to a motion for judgment as a matter of law. Summit Tech. Inc. v. Nidek Co., 363

---

**12.** Unless otherwise noted, all references to "Rule" are to the Federal Rules of Civil Pro- cedure.

F.3d 1219, 1223 (Fed.Cir.2004). In the Ninth Circuit, a jury's verdict "must be affirmed if there is substantial evidence to support the verdict." "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." Gilbrook v. City of Westminster, 177 F.3d 839, 856 (9th Cir.1999) (citation omitted). The court should only enter judgment as a matter of law if "the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's." Callicrate v. Wadsworth Mfg., Inc., 427 F.3d 1361, 1366 (Fed.Cir.2005) (citing Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir.2002)).

■ As a preliminary matter, Plaintiff contends that this motion is untimely because judgment has not yet been entered against Defendants. (Plaintiffs' Opposition at 1.) Defendants disagree, citing Rule 50(b) for the proposition that their motion "addresses a jury issue not decided by a verdict." (Defendants' Reply at 1.) Neither party is correct. As explained below, the jury's verdict does in fact decide the issue of induced infringement. However, the motion is nonetheless timely because Rule 50 does not, by its terms, preclude the filing of a renewed motion for judgment as a matter of law before judgment has been

entered. It merely requires that once the judgment has been filed, a party has only 28 days to file its motion. See Boehringer Ingelheim Vetmedica, Inc. v. Schering–Plough Corp., 106 F.Supp.2d 696, 699–700 (D.N.J.2000) ("These rules do not, by their terms, preclude the filing of post-trial motions before 'judgment' has been filed; they merely require that once 'judgment' has been filed, a party has only 10 days to file the motions.").[13]

## 2. Motion for New Trial

■ Similar to Rule 50 motions, the law of the regional circuit governs a district court's grant or denial of a motion for new trial under Rule 59(a) in patent cases. Callicrate, 427 F.3d at 1366. Rule 59(a) of the Federal Rules of Civil Procedure governs whether a court should grant a motion for a new trial. Fed. R. Civ. P. 59(a). Under Rule 59(a), a new trial may be granted to any party on all or part of the issues, "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. Civ. P. 59(a). The grounds upon which a court may grant a new trial are not enumerated in Rule 59(a). Nevertheless, courts commonly grant new trials "if the verdict is contrary to the clear weight of evidence ... or to prevent a miscarriage of justice." Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir.2007) (quoting Passantino v. Johnson & Johnson

**13.** Case law supports this interpretation of Rules 50 and 59. See Jurgens v. McKasy, 905 F.2d 382, 386 (Fed.Cir.1990) (holding that "ten day limit in Rule 59 sets only a maximum period and does not nullify an otherwise valid motion made before a formal judgment has been entered."); Warner v. Rossignol, 513 F.2d 678 (1st Cir.1975) (court could consider motion for new trial even though judgment had not been entered); Garrett v. Blanton, 1993 WL 17697 (E.D.La.1993) (Court could sua sponte grant new trial under Rule 59(d) before a Rule 59 "judgment" was entered); DeLong v. International Union, 850 F.Supp. 614, 618, n. 19 (S.D.Ohio 1993) (motion for new trial may be filed even though a court has not entered final judgment such that court may rule on such a motion even though final judgment has not yet been entered); Manos v. TWA, 324 F.Supp. 470 (N.D.Ill.1971) (where motion to amend judgment and for new trial was filed before "judgment" was entered, court could consider motions because 10-day rule is maximum filing requirement). But see Hiebert Contracting Co. v. Trager, 274 F.Supp. 801 (D.Mass.1967) (dismissing without prejudice a Rule 59 motion filed before judgment was entered or any findings on the issue of damages were filed).

Consumer Prods., 212 F.3d 493, 510 n. 15 (9th Cir.2000)).

■ In considering a motion for a new trial, the court must "determine whether the verdict is consistent with the evidence after considering all of the events of trial. The judge must review the evidence, view all the evidence as a whole, and weigh the relative strengths and weaknesses of the evidence." Turnbull v. Am. Broad. Cos., No. CV 03–3554–SJO (FMOx), 2005 WL 6054964, at *2 (C.D.Cal. Mar. 7, 2005) (quoting 12 James Wm. Moore et al., Moore's Federal Practice § 59.13[2][f] ). A new trial may be granted "only if the verdict is so clearly against the weight of evidence as to amount to a manifest miscarriage of justice." Id.; accord E.E.O.C. v. Pape Lift, Inc., 115 F.3d 676, 680 (9th Cir.1997) (stating that a new trial may be granted "only if the verdict is against the great weight of the evidence or it is quite clear that the jury has reached a seriously erroneous result").

■ The corollary to this principle is that a court "must uphold a jury verdict if it is supported by substantial evidence." Guy v. City of San Diego, 608 F.3d 582, 585–86 (9th Cir.2010). Evidence is sufficiently "substantial" to support a jury's finding when it is " 'adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.' Specifically, [courts] must uphold a jury's damages award unless the amount is 'clearly not supported by the evidence, or only based on speculation or guesswork.' " Id. (quoting Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir.2002); L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 791 F.2d 1356, 1360 (9th Cir.1986)). Moreover, the

Court has "a duty 'to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence.' " Id. at 586 (quoting Pierce v. S. Pac. Transp. Co., 823 F.2d 1366, 1370 (9th Cir. 1987)); accord Gallick v. Baltimore & O.R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963) ("We therefore must attempt to reconcile the jury's findings, by exegesis if necessary, ... before we are free to disregard the jury's special verdict and remand the case for a new trial."); Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.").

**B. The Verdict Form Supports Entry of Judgment on Induced Infringement** [14]

■ The verdict form asked the jury to decide whether Kaneka proved by a preponderance of the evidence that "SKC, Samsung *and/or* LG" directly infringed the asserted claims of the '064 and '961 Patent. (Verdict ¶¶ 6, 9, emphasis added.) It did not require the jury to make a specific finding as to each individual entity. Defendants contend that this was an error because it was Kaneka's burden to prove that each individual entity directly infringed the patents. (Defendants' Opposition at 8.) Defendants also contend that, for the same reason, the jury's findings regarding SKPI's knowledge or willful blindness of the patents-in-suit as well as SKPI's active and intentional inducement of SKC, Samsung, "and/or" LG are insufficient. (Id. at 8-9.)

---

14. In their motion for judgment as a matter of law, Defendants incorporate by reference arguments made in opposition to Plaintiff's motion for entry of judgment—specifically the argument that the jury's verdict does not contain the necessary findings to support entry of judgment on Plaintiff's claims of induced infringement. (Defendants' Motion at 2.) Because this argument is a precondition to Defendants' motion for judgment as a matter of law, the Court addresses it here.

In rebuttal, Kaneka makes two arguments. First, Kaneka states that "the necessary inferences" to be drawn from the verdict and the jury instructions demonstrate that the jury inherently found that SKC, Samsung, and LG each directly infringed the '064 and '961 Patents. (Plaintiff's Reply at 4-5.) Second, Kaneka argues that, in any event, the jury was not required to find that SKC, Samsung, and LG each directly infringed the patents-in-suit because there is an "entire category of infringers" in this case, which Kaneka identifies as "the importers [into the United States] of SKPI's polyimide film." (Id. at 8.) Because there is an entire category of infringers, Kaneka "may cast [its] theor[y] of vicarious liability more broadly, and may consequently seek damages or injunctions across the entire category." (Id. citing Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1274 (Fed.Cir.2004).) The Court agrees with Kaneka on both points. The jury did inherently find that each individual entity directly infringed the patents-in-suit. (See infra § II.C.1.) More germane to the issue of whether the verdict form supports entry of judgment, however, is the fact that in this case there is an entire category of infringers, and therefore Kaneka was permitted to cast its theory of vicarious liability across the entire category, as explained below.

 There are two ways in which a patentee may prove induced infringement. Where products necessarily infringe a patent—i.e., where there are no substantial non-infringing uses of the patent—a patentee may base its theory of liability upon an entire class of infringers, such as the defendant's customer base, and may cast its theory of vicarious liability across the en-

tire category. Dynacore, 363 F.3d at 1275–76. However, where there are substantial non-infringing uses of the product, a patentee must then "point to a specific instance of direct infringement and restrict its suit to liability stemming from that specific instance." Id. at 1276. Defendants argue that Kaneka's theory of liability must be restricted to "identified acts of direct infringement" because there are substantial non-infringing uses of its polyimide film. (Defendants' Sur-Reply at 3.) Defendants also contend that Kaneka never argued that SKPI's film "necessarily infringes," and as such, should be precluded from making that argument for the first time post-trial. Id.

 In support of their argument that SKPI's films have substantial non-infringing uses, Defendants attempt to argue that because SKPI sells film all over the world, much of its film never enters the United States, and therefore, the film is capable of "non-infringing uses." (See Defendants' Reply at 2.) This argument is illogical. A product can only be capable of "non-infringing uses" in the context of United States patent law if the non-infringing use occurs within the territorial United States, because literally every product or device is non-infringing outside of the United States. See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 711 F.3d 1348, 1371 (Fed.Cir.2013) ("It is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad").

Defendants also argue that certain samples or "versions" of its films do not infringe Kaneka's patents,[15] and therefore, its film is capable of "non-infringing uses." (Defendants' Reply at 2.) This argument

---

15. This includes samples that Kaneka's expert, Dr. Harris, testified did not infringe and versions that Kaneka abandoned at the summary judgment phase because Dr. Harris did

not perform an infringement analysis on those samples. (See MSJ Order at 17; Testimony of Dr. Harris, Trial Transcript Nov. 12, 2015 a.m. at 28:1-5.)

also fails. "Non-infringing use" specifically contemplates a situation where a single product can be used in multiple ways. See Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 932, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005) (recognizing "patent law's traditional staple article of commerce doctrine, now codified [in 35 U.S.C. § 271(c) holds] that distribution of a component of a patented device will not violate the patent if it is suitable for use in other ways"); see also Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1343 (Fed. Cir.2001) (finding inducement where an accused device was capable of non-infringing modes of operation in unusual circumstances); see also Ricoh Co., Ltd. v. Quanta Computer, Inc., 550 F.3d 1325, 1336 (Fed. Cir.2008) (triable issue of fact existed regarding direct infringement where the defendant's computers were capable of a "use" which infringed the plaintiff's patented process but could also be "used" to read discs in a non-infringing manner); ACCO Brands, Inc. v. ABA Locks Mfr. Co., 501 F.3d 1307, 1313 (Fed.Cir.2007) (accused device could be "operated in either of two modes," the infringing method or the non-infringing method; as such, it did not "necessarily infringe" the patent-in-suit). There is no allegation here that the accused polyimide film can be "used" or "operated" in a way that does not infringe. It is immaterial that certain samples of Defendants' products either were not tested or were found not to infringe, because for each accused product, at least one sample *representative* of that product was found to infringe.[16]

(Verdict ¶¶ 2, 3, 7, 10, 12.) This is sufficient for a finding of infringement for an accused product. Grain Processing Corp. v. American Maize–Products, Co., 840 F.2d 902, 911 (Fed.Cir.1988) (finding that a patentee can prove infringement by showing that just "some samples" or even "a sample" of the product is found to meet all the limitations of a patent's claims). Because there are no substantial non-infringing uses of the accused polyimide film, the film necessarily infringes.

Further, contrary to Defendants' contention, Kaneka's liability theory was always that SKPI's film necessarily infringed its patents. Because the patents are territorially limited to the United States, Kaneka can only prove infringement once the film is imported into the United States. See Power Integrations, Inc., 711 F.3d at 1371. To that effect, Kaneka argued to the jury—and proved by a preponderance of the evidence—that certain types of SKPI's polyimide film necessarily infringed its patents once the film was imported into the United States. (See Verdict ¶¶ 1, 3, 6, 9.) That Kaneka only introduced evidence of direct infringement by SKC, LG, and Samsung does not support Defendants' claim that Kaneka's theory of the case is based on "specific acts of alleged direct infringement." (Defendants' Sur-Reply at 4.) Rather, the limitation to those entities—a subset of SKPI's customers—reflected Kaneka's ability to prove that those entities imported infringing film into the United States. Any of SKPI's customers, downstream or otherwise, would have di-

---

**16.** SKPI's sales team leader, Mr. Song, provided Plaintiff with the samples, and testified that the samples or "versions" of polyimide film produced to Kaneka "are representative samples of our products." (See Testimony of Mr. Song, Nov. 17, 2015 Trial Transcript at 26:1-27:22.) Dr. Sue Mecham, Defendants' expert on infringement, confirmed as much, testifying that she understood that Kaneka's expert "was provided with all the rolls avail-

able" from SKPI and that SKPI "was asked to provide representative products and that's what they did." (Testimony of Dr. Mecham, Nov. 12, 2015, p.m. session, at 67:24-69:21.) This is further confirmed by SKPI's sales records, which only indicate product names, i.e. the "type" of film, and do not differentiate between samples or "versions." (See Trial Exhibits 53-61.)

rectly infringed Kaneka's patents by importing the infringing polyimide film into the United States because the film practiced Kaneka's patents.

Because the jury found that the accused polyimide film which was imported into the United States necessarily infringed the '064 and '961 Patents, Kaneka did not need to prove "specific instances of direct infringement" and was not required to restrict its suit to liability stemming from that specific instance. Dynacore, 363 F.3d at 1276. Instead, Kaneka was permitted to base its theory on a class of infringers— SKPI's customers that imported polyimide film into the United States. Id. Therefore, the verdict form, which permitted the jury to find that "SKC, Samsung and/or LG" infringed the '064 and '061 Patents, was proper and contained all of the "essential elements" of Kaneka's claims of induced infringement. (See Verdict ¶¶ 9, 11.)

## C. Sufficient Evidence Supports the Jury's Verdict

■ "In order to succeed on a claim of inducement, the patentee must show first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." Symantec Corp. v. Computer Assocs. Int'l., Inc., 522 F.3d 1279, 1292 (Fed.Cir.2008). Defendants argue that there is insufficient evidence to support a verdict against SKPI for induced infringement of the '064 and '961 Patents because: (1) Kaneka failed to present any evidence that Samsung or LG imported products containing infringing film into the United States, (Defendants' Motion at 4-9); (2) there is no evidence that SKPI had knowledge of the '064 Patent prior to the

filing of this lawsuit; (id. at 9-13); and (3) there is no evidence that SKPI actively and intentionally took steps to induce SKC, Samsung, and/or LG to infringe Kaneka's patents, (id. at 13-22). As discussed below, the Court is not persuaded by these arguments.

## 1. Evidence of Direct Infringement by LG and Samsung

■ To succeed on its claim of indirect infringement against SKPI, Kaneka must prove underlying direct infringement. Symantec Corp., 522 F.3d at 1292. Direct infringement can be proven by circumstantial evidence. Vita–Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1326 (Fed.Cir.2009). This circumstantial evidence need only show that "at least one person directly infringed an asserted claim during the relevant time period." Toshiba Corp. v. Imation Corp., 681 F.3d 1358, 1364 (Fed.Cir.2012); see also Lucent Tech., Inc. v. Gateway, Inc., 580 F.3d 1301, 1317 (Fed.Cir.2009) (finding the patentee presented sufficient circumstantial evidence to show that it was "more likely than not one person somewhere in the United States had performed the claimed method using the Microsoft products.").

Although the jury's finding of induced infringement does not specify which entity directly infringed the patents, the Court can reasonably infer from the jury's other findings that it found Samsung and LG directly infringed Kaneka's patents. The jury awarded Kaneka a total of $13,488,765 in lost profits for SKPI's induced infringement.[17] (Verdict ¶¶ 19, 22.) This figure came directly from Brian Napper, Kaneka damages expert, who testified that the film SKPI sold in Korea ultimately wound up in

---

**17.** Specifically, the jury awarded $5,920,389.50 for infringement of the '064 Patent and $7,568,375.56 for the '961 Patent. (Verdict ¶¶ 19, 22.) These figures are consis-

tent with Napper's testimony at trial that Kaneka's damages totaled $13,488,765. (Trial Transcript, Nov. 10, 2016 p.m., at 59:2-66:2.)

Samsung and LG phones that were imported into the United States. (Trial Transcript, Nov. 10, 2016 p.m., at 59:2-66:2.) Napper explicitly excluded SKC from his lost profits analysis due to their low volume of sales. (Id. at 39:8-16.) By adopting Napper's opinion for the total amount of damages, the jury inherently found that Samsung and LG directly infringed the patents-in-suit. Moreover, the jury found SKPI induced infringement of products other than those sold by SKC, (Compare Verdict ¶¶ 2, 3 with ¶¶ 7, 10), meaning it necessarily found that SKC was not the only entity that SKPI induced to infringe. Because the jury's verdict is premised on the finding that Samsung and LG directly infringed Kaneka's patents, the inquiry for purposes of Defendants' Motion is whether evidence supports that finding.[18]

Defendants contend that no evidence supports the jury's finding that LG and Samsung directly infringed Kaneka's patents. (Defendants' Motion 4-9.) First, Defendants repeat their argument that Kaneka must prove "individual acts of direct infringement." (Motion at 4.) As discussed above, this is inaccurate. See § II.B. Kaneka proved that the accused film necessarily infringes the patents-in-suit, which is sufficient to sustain a jury verdict of induced infringement so long as the evidence introduced at trial supports a finding that a

"class of infringers"—here, SKPI's customers—imported products into the United States which incorporated the accused film. See ACCO Brands, Inc., 501 F.3d at 1313.

Next, Defendants argue that there is no proof that Samsung or LG acted as a U.S. importer, distributor, or retailer of its phones. Defendants claim that it is "the normal course of business" for third parties unrelated to a manufacturer to import into the U.S. products manufactured abroad. (Defendants' Motion at 5.) This is a bald assertion contradicted by ample evidence. The evidence introduced at trial demonstrated that Samsung and LG directly imported phones into the United States. Napper testified that Samsung and LG, "absolutely sell phones into the U.S., yes." (Trial Transcript, Nov. 10, 2015, p.m., at 31:7-11.) Further, a document produced by SKPI states that "Samsung's shipping percentage to the U.S. is about 20%," indicating that Samsung—not some unidentified third party—ships its phones into the U.S. (Trial Exhibit 278 at 1.) There is no evidence that any third party sold phones into the United States. Accordingly, this argument is unpersuasive.

Defendants further argue that, even if Samsung or LG imported phones into the United States, there is no evidence that any of those phones contained SKPI's po-

---

**18.** Defendants' briefing on this issue is contradictory. In their Sur-Reply to Plaintiff's Motion, Defendants contend that the jury's verdict does not support a finding that LG and Samsung directly infringed Kaneka's patents because it states *either* "Samsung, LG, and/or SKC" infringed the patents. (Sur-Reply at 5.) However, if that truly is Defendants' position, it would directly undermine their motion for judgment as a matter of law, which is limited to the argument that no substantial evidence supports the jury's verdict that Samsung and LG directly infringed the patents. Defendants are not moving for judgment as a matter of law that SKC did not directly infringe the patents. Therefore, if De-

fendants concede that substantial evidence supports the jury's finding as to SKC, any argument regarding Samsung or LG would be irrelevant. See Toshiba Corp., 681 F.3d at 1364 (evidence to prove underlying direct infringement need only show that "at least one person directly infringed an asserted claim during the relevant time period"). Because the Court finds that the jury inherently found both Samsung and LG directly infringed Kaneka's patents, the Court will address the arguments made in Defendants' Motion. However, the Court cautions Defendants against taking such contradictory and self-defeating positions in the future.

lyimide film. (Defendants' Motion at 7.) This is also incorrect. Kaneka was not required to point to a specific phone in the United States that contained SKPI's film; rather, Kaneka was permitted to use circumstantial evidence to demonstrate that it is more likely that not that a phone imported into the United States contained SKPI's film. See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 449 Fed. Appx. 923, 928 (Fed.Cir.2011) (citing Lucent Tech., Inc. v. Gateway, Inc., 580 F.3d 1301, 1317–18 (Fed.Cir.2009) ("Nor is a patentee required to prove direct infringement to a complete certainty. A patentee is only required to prove direct infringement by a preponderance of the evidence—that it is more likely than not that the direct infringement occurred."); see also Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed.Cir.1986) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). This is precisely what Kaneka did through the testimony of its damages expert, Brian Napper, and the introduction of SKPI's own documents demonstrating that Samsung and LG make phones containing SKPI's film.

Napper testified that unlike markets for other products, or markets in other areas of the world, the polyimide film market in Korea is unique because it involves only a few players, and the market is relatively closed. (Trial Transcript, Nov. 10, 2015 p.m., at 30:18-31:3.) To this end, Napper described a step-by-step process through which SKPI's polyimide film is sold to manufacturers of flexible copper clad laminates ("FCCLs"), who sell FCCLs to manufacturers of flexible printed circuit board ("FPCs"), who then sell FPCs to the final "set-makers," such as Samsung and LG, who incorporate FPCs into mobile phones. (Id. at 59:22-64:15.) First, Napper identified the total amount of polyimide film SKPI sold in the relevant damages period—130 million square meters of film—which he gathered from SKPI's sales records. (Id. at 59:11-17.) Next, he reduced that amount to include only film which was sold within Korea: 98 million square meters. (Id. at 59:22-25.) Next, he only included film sold to two particular FCCL manufacturers, Innox and Hanwha—73 million square meters—because he believed it was only appropriate for Kaneka to claim lost sales to those manufacturers. (Id. at 60:2-8.) Of the film sold to Innox and Hanhwa, Napper deducted 7.5% for "leakage" because Mitsui Company, Kaneka's agent, estimated that Innox and Hanwha might ship some of their FCCL product outside of the Korean supply chain. (Id. at 60:13-61:16.) This resulted in 67 million square meters of SKPI film. (Id. at 62:13-16.) The next adjustment Napper made was to account for the fact that not all polyimide film makes its way into mobile devices. (Id. at 61:18-23.) For this, Napper estimated—using two figures provided by SKPI—that 75% of SKPI's film ends up in mobile phones, for a final figure of 50 million square meters of SKPI film. (Id. at 61:23-62:4.)

To estimate the percentage of Samsung and LG phones that are imported into the United States, Napper used two sources. The first is SKPI's own estimate that approximately 20 percent of Samsung phones come into the United States. (Id. at 63:16-25.) The second is data compiled by Bloomberg IDC, a market research company that tracks mobile device sales throughout the world. (Id. at 29:15-18.) Depending on the year, between 15 and 24 percent of Samsung and LG's mobile phones were sold in the United States. (Id. at 63:6-12.) Napper used these figures to estimate that roughly 20 percent of the 50 million square meters of SKPI film sold to Samsung and LG wound up in mobile phones imported into the United States. (Id. at 64:8-15.)

Defendants argue that Napper's analysis is flawed because it does not account for polyimide film supplied to Samsung and LG from manufacturers other than SKPI, such as Kaneka. (Defendants' Motion at 7.) However, there was substantial evidence that SKPI was the primary supplier, if not the sole supplier, of polyimide film to Samsung and LG for use in their mobile phones. SKPI's internal business records demonstrate its understanding of the closed Korean market and that Samsung and LG products were the final set makers. (Trial Exhibit 276; 387; and 237 at 25.) According to minutes from a 2010 meeting between SKPI and Samsung, 90% of Samsung Mobile Display products use FPCs and all of those products use SKPI film. (Trial Exhibit 207; see also Trial Exhibit 219 at 4.) SKPI itself presumed that SKPI has 97% of the Korean polyimide film market. (Trial Exhibit 315.) SKPI noted that increased demand of SKPI's film was due to a rapid increase sales of Samsung's Galaxy S3 in the United States. (Trial Exhibit 329 at 1-2.) In a 2009 Strategic Meeting presentation, SKPI reported that a rapid increase in Samsung/LG mobile phone sales resulted in a flourishing FPC market, and because FPC manufacturers source from the domestic Korean market, SKPI market share had increased. (Trial Exhibit 200 at 2.) In 2010, SKPI recognized that it may be adversely affected by LG's struggling mobile phone sales. (Trial Exhibit 217.) Moreover, SKPI met with Innox to establish a business relationship that would increase the sales of polyimide film to Innox, which would ultimately increase sales to LG and Samsung. (Trial Transcript Nov. 10, 2015 a.m., at 29:19-30:1.) Accordingly, it is reasonable for the jury to conclude that the primary source of the polyimide film used in Samsung and LG's phones came from SKPI. See Lucas Aerospace, Ltd. v. Unison Indus., L.P., 899 F.Supp. 1268, 1287 (D.Del.1995) (finding substantial evidence supported the jury's finding that infringing products were sold in the U.S. where 50% of the alleged direct infringer's engines incorporated the accused product, and 55 to 60% of all engines were sold in the U.S.).

Defendants also argue that Napper's analysis is dependent on the unsupported assumption that all of Samsung's and LG's phones contain polyimide film. (Defendants' Motion at 7.) It is true that Napper testified that he "cannot confirm whether every cell phone mobile device sold into the United States contains polyimide film." (Trial Transcript, Nov. 10, 2015, p.m. at 72:21-22). However, for purposes of induced infringement, Kaneka simply needed to prove that SKPI induced one person to directly infringe Kaneka's patents. The data Napper relied upon demonstrates that, during the damages period, 50 million square meters of SKPI's film wound up in Samsung's and LG's mobile phones. It is certainly reasonable for the jury to infer that, because Samsung and LG import between 15 and 24 percent of its mobile phones into the U.S., at least some of those phones contained infringing film.

Finally, Defendants argue that some of that 50 million square meters of film "necessarily" does not infringe Kaneka's patents because certain samples of SKPI's film were found not to infringe. (Defendants' Motion at 7.) As stated above, Defendants "samples" versus "version" argument is unavailing. See § II.B. In any event, Napper testified that the films Dr. Harris concluded did not infringe the patents-in-suit were "not in [his] analysis." (Trial Transcript Nov. 10, 2015 p.m. at 97:7-13.)

Accordingly, substantial evidence supports the jury's implicit finding that both LG and Samsung directly infringed Kaneka's patents.

## 2. Pre-suit knowledge of '064 Patent

 Induced infringement requires the patentee to prove that the infringer had knowledge that the induced acts constituted infringement. Global–Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 131 S.Ct. 2060, 2068, 179 L.Ed.2d 1167 (2011). This "necessarily includes the requirement that [the infringer] knew of the patent." DSU Medical Corp. v. JMS Co., 471 F.3d 1293, 1304 (Fed.Cir.2006). Evidence of pre-suit knowledge of a patent can be circumstantial. SynQor, Inc. v. Artesyn Techs., Inc., No. 2:07–CV–497–TJW–CE, 2011 WL 3624957, at *7 (E.D.Tex. Aug. 17, 2011) aff'd, 709 F.3d 1365 (Fed.Cir.2013).

 The relevant damages period for the '064 Patent is from June 2008, when SKPI formed, to March 2010, when the '064 Patent expired. (Trial Transcript, Nov. 10, 2015 p.m., at 82:7-19.) This means Kaneka had to prove by a preponderance of the evidence that SKPI had knowledge of the '064 Patent before this suit was filed. Cf. Locata LBS, LLC v. Yellowpages.com, LLC, No. LA CV13–07664 JAK SH, 2014 WL 2581176, at *3 (C.D.Cal. Apr. 18, 2014) (knowledge of the existence of a patent at the time of filing the complaint is sufficient for a patent that is valid at the time the suit is filed). The jury found that Kaneka met its burden and that the earliest date that SKPI was aware of the '064 Patent was August 5, 2004. (Verdict ¶¶ 4, 5.) Defendants argue that there is no evidence of record to support this finding, particularly in light of the fact that SKPI was not formed until 2008. (Defendants' Motion at 9.) The Court is not convinced.

Dong-Yong Won, an employee of SKPI, testified that prior to the formation of SKPI, he worked as an engineer for SKC Co., Ltd.—SKPI's predecessor—and that while there, he conducted searches for patents related to polyimide films. (Trial Transcript, Nov. 6, 2015 a.m., at 40:15-51:16.) During this time period—approximately twelve or thirteen years ago (around 2002 or 2003)—he was "trying to search as many patents as possible," including searches for Kaneka's U.S. and Japanese patents. (Id. at 47:2-5, 22-23.) The SKPI "Project Completion Report," which contains data relevant to the 2004 time-period, confirms his testimony in that the patent searches SKC Co., Ltd. performed related to polyimide film, which included Kaneka's patents in the U.S. and Japan. (Trial Exhibit 274 at 21.)

Defendants argue that the patent searches could not have discovered the '064 Patent because the searches were for the term "polyimide film"—a term which was not actually in the '064 Patent. (Defendants' Motion at 10-11.) However, a Certificate of Correction for the '064 Patent, which was filed in 1993, changed the word "polyamide" to "polyimide," rendering Defendants' argument on this point unpersuasive. (Trial Exhibit 1 at 7.) Regarding the August 5, 2004 date, the purchase contract between Hirano—the company to which Kaneka licensed the right to create polyimide film manufacturing equipment which practiced the '064 Patent—and SKPI's predecessor, SKC Co., Ltd., states that Hirano supplied specifications for a belt dryer—which is used to manufacture polyimide film—to SKC Co., Ltd. on August 5, 2004. (Trial Exhibit 40 at 4.)

Further, Kaneka presented evidence that SKPI's own training manual included a depiction of a belt dryer that is copied directly from the Japanese version of the '064 Patent. (Trial Exhibit 70 at 19.) This belt dryer depiction is almost identical to that depicted in the '064 Patent, which constitutes substantial evidence that SKPI had knowledge of Kaneka's patented invention. (Compare Trial Exhibit 1 at 2 with Trial Exhibit 70 at 19.) This case is distinct from Vasudevan Software, Inc. v. TIBCO Software Inc., in which a court

held that "requisite knowledge of the patent allegedly infringed simply cannot be inferred from mere knowledge of *other* patents, even if somewhat similar." No. C 11-06638 RS, 2012 WL 1831543 at *3 (N.D.Cal. May 18, 2012) (emphasis in original). Here, the patents are not simply "somewhat similar," but in fact describe the same method and apparatus. Further, unlike in Vasudevan, there is evidence here that SKPI's predecessor completed extensive searches for Kaneka's polyimide film patents in Japan and the U.S. Therefore, it was reasonable for the jury to infer that if SKC Co., Ltd. found Kaneka's Japanese patent application for a particular method and apparatus—a method and apparatus SKPI found important enough to include in its training materials—then it is more likely than not that it found Kaneka's U.S. patent for the same technology.

From this evidence, it was reasonable for the jury to infer that SKPI's predecessor, SKC Co., Ltd., had knowledge of the '064 Patent on August 5, 2004, the date it received belt dryer specifications for polyimide film manufacturing equipment that practiced Kaneka's patent. Because SKC. Co., Ltd. is SKPI's predecessor, its knowledge can be imputed to SKPI, particularly because many of the same people involved in SKC Co., Ltd.'s polyimide film production department moved over to SKPI to work on the same projects. (Trial Transcript, Nov. 6, 2015 a.m., 41:9-42:16.) Accordingly, the Court finds that substantial evidence supports the jury's verdict that SKPI had knowledge of the '064 Patent before Kaneka filed its Complaint on July 26, 2010.

### 3. SKPI Actively and Intentionally Induced Infringement

▬▬▬ Finally, to prove induced infringement, Kaneka must "show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." Info-Hold, Inc. v. Muzak LLC, 783 F.3d 1365, 1372 (Fed.Cir. 2015) citing Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 131 S.Ct. 2060, 2068, 179 L.Ed.2d 1167 (2011)). The knowledge requirement may be satisfied by showing actual knowledge or willful blindness. Global-Tech Appliances, Inc., 131 S.Ct. at 2072.

As the Court noted in its summary judgment order, this case presents a conceptual difficulty regarding the intent element of inducement because the case stems from a distinct type of direct infringement: manufacturing abroad a product accused of violating a United States patent, of which there are no non-infringing uses, and which is then imported into the United States by a third party. (MSJ Order at 26-27.) The Court elaborated:

Normally, induced infringement involves encouraging a third party to use a product in an infringing manner; for example, by providing how-to instructions. See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 914 [125 S.Ct. 2764, 162 L.Ed.2d 781] (2005) ("Evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe.") At base, the focus should be on the wrongdoing, which was SKPI's encouragement of Samsung and LG to incorporate an allegedly infringing polyimide film into their phones, combined with SKPI's knowledge the phones would be sold in the United States. The fact that infringement occurred only when Samsung and LG imported the products into the United States does not mean that the inducement of the importation should be the focus of the inquiry. The peculiarities of the intersection of patent law and the relevant parties' international configura-

tion should not immunize SKPI from liability. Accord Wing Shing [Products (BVI), Ltd. v. Simatelex Manufactory Co., 479 F.Supp.2d 388, 411 (S.D.N.Y. 2007)] ("[T]he production and sale of an infringing product knowing that the buyer will sell the product in the United States fits comfortably within [the] expanded definition of inducement as "encouragement" or "aiding and abetting"); see also Water Techs. [Corp. v. Calco, Ltd.], 850 F.2d [660] at 669 [ (Fed.Cir. 1988) ] ("The requisite intent to induce infringement may be inferred from all of the circumstances.").

(Id. at 27.) The Court remains persuaded by the district court in Wing Shing. As such, evidence that SKPI knew its film infringed Kaneka's patents and that it actively and intentionally sold this film knowing that it would be incorporated into Samsung and LG phones which would arrive in the United States is sufficient to establish that SKPI actively and knowingly aided another's direct infringement. Accord Halo Electronics, Inc. v. Pulse Engineering, Inc., 810 F.Supp.2d 1173, 1209 (D.Nev. 2011) (denying summary judgment on induced infringement where the defendant's corporate representative believed that at least some of the accused products ended up in the United States).

### i. SKPI's Knowledge that its Film Would Ultimately Be Sold in the United States

The relevant damages period for the '064 Patent—and thus, the period for which Kaneka had the burden to prove

SKPI's knowledge that Samsung and LG imported phones into the U.S. containing the accused film—begins in June of 2008— SKPI's formation—and ends March 14, 2010, the patent's expiration. The relevant damages period for the '961 Patent begins with the initiation of this lawsuit on July 26, 2010.[19] Thus, for Kaneka to prevail on its claim for induced infringement of the '064 and '961 Patents, sufficient evidence must support the finding that SKPI had knowledge that Samsung and LG imported phones into the U.S. containing the accused film beginning in June of 2008 and continuing through trial. Despite Defendants' contentions, ample evidence was introduced at trial to support a finding that SKPI knew, beginning at least in June of 2008, that Samsung and LG were importing phones into the United States which contained the infringing film.

As an initial matter, SKPI does not dispute that substantial evidence supports the contention that SKPI actively and intentionally took steps to increase sales of polyimide film in Korea to Innox and Hanwha, which SKPI knew aimed to increase supply to Samsung and LG in Korea.[20] (Defendants' Motion at 16-17.) Rather, SKPI argues there is no evidence that it knew Samsung and LG would import phones into the U.S. which contained infringing film. The Court disagrees.

At trial, Keum Soo Song, SKPI's sales team leader, testified that SKPI monitors the sales of mobile phones in the United States and other areas by "look[ing] at

---

**19.** The '961 Patent was issued on April 6, 2010, three months before this suit was filed on July 26, 2010. (See Exhibit B to Complaint, Doc. No. 1.) Kaneka does not contend that SKPI had pre-suit knowledge of the '961 Patent.

**20.** This is supported by both documentary evidence and testimony from SKPI witness Keum Soo Song: on December 22, 2008, leaders of SKPI and Innox met to devise a strategy to increase sales of polyimide film to Innox, and FCCL company, which would increase the sales of polyimide film to the FPC makers, which would increase sales to LG Mobile Communications and Samsung Mobile Communications. (See Trial Exhibit 181 and Trial Transcript Nov. 10, 2015, a.m. at 29:19-30:1.)

newspaper articles and such." (Trial Transcript of November 10, 2015, a.m., at 31:18-32:1.) He continued:

> Although we track or monitor as to what happens after we sell our products to FCCL makers and FPCB makers, we try to do so to figure out the sales status and the actual use of the items sold. However, for instance, LG Electronics' number of models that they sell per year is over 100 in number, so we have no idea as to where the end consumers would be directly and which countries.

(Id. at 32:11-17.) This testimony was elicited in response to a question about a June 25, 2010 e-mail detailing LG's mobile phone sales, including sales in the United States, and the effect of those sales on SKPI's polyimide film sales. (Exhibit 217, Doc. No. 715-36.) The e-mail states, "Since it is possible that our company may also be adversely affected by many factors including pressure to lower price and a supply reduction, we should adapt [to] this changing environment by more intensely monitoring the current situation." (Exhibit 217 at 1.) At trial, Mr. Song testified that the e-mail reflects a concern that LG's mobile phone sales in the United States and other markets affect SKPI. (Trial Transcript of November 10, 2015, a.m., at 31:10-17.)

When testifying about SKPI's practice of tracking and monitoring the sales of mobile phones, Song did not limit his statements to a specific time period. Rather, he spoke in the present tense. Thus, the jury could reasonably infer that this is—and has been—a general practice kept by SKPI. Given Song's testimony that SKPI tracks and monitors its polyimide film after its sells its products, it was reasonable for the jury to combine such testimony with that of Plaintiff's expert, Napper, who testified that for each year in the relevant damages period for this case, between 15 and 24 percent of Samsung and LG's mobile phones were sold in the United States. (Trial Transcript Nov. 10, 2015, p.m., at 63:6-12.) This data comes from Bloomberg IDC, a market research company that tracks mobile device sales throughout the world. (Id. at 29:15-18, 63:1-6.) As such, it would have been reasonable for the jury to infer that if SKPI tracks its polyimide film through the supply chain, it would have discovered the same data Napper discovered, and it would have known that its products are ultimately imported into the United States for all relevant years in the damages period.

Such an inference is all the more reasonable given the additional evidence produced by Kaneka that SKPI was tracking Samsung mobile phone sales. A report of a meeting between Samsung Mobile Display ("SMD") and SKPI on March 10, 2010 noted that the "world economy" was recovering and that "world demand" for SMD products was high. (See Trial Exhibit 207.) The report noted that SMD sales in 2009 totaled "3,090,000," and predicted a 17.5% increase for 2010 for a total of "3,630,000." (Id.) The report further noted that 90% of Samsung Mobile Display products use FPCB and all of them use SKPI film.[21] (Id.) It stated, "[c]urrently, we don't keep up with the demand although we are producing at full capacity." (Id.) From this evidence it is reasonable to infer that SKPI knew its polyimide film products were incorporated into 90% of SMD products, including mobile phones,[22] and that these phones were shipped worldwide. It is further reasonable for the jury to infer

---

**21.** At trial, Song disputed the accuracy of this statement, but the jury was entitled to disbelieve him and rely on the documentary evidence. (Trial Transcript Nov. 10, 2015 at 56:2-57:10.)

**22.** Song testified that SMD supplies modules to cellphone makers. (Trial Transcript, Nov. 10, 2015, a.m., at 57:25-58:2.)

that SKPI knew that the United States was included in the "world economy" and "world demand" noted in the report. Further still, it is reasonable to infer that SKPI had knowledge that its film was incorporated into these products in 2009. The report contains data regarding worldwide sales of SMD products for 2009, and Song testified that SKPI tracks and monitors the supply chain after they sell their products.

Moreover, in September of 2010, a Marketing Performance and Plan for SKPI contained a detailed market analysis· of Samsung's mobile phone sales in the U.S. (See Trial Exhibit 278.) SKPI noted a 10% decrease compared to the prior year for sales by Samsung of mobile phones and further that approximately 20% of Samsung's phones ship to the United States. (Id.) The plan also contained an update on the Apple v. Samsung litigation taking place in the United States, noting that "the sale of 8 products is prohibited in the U.S." (Id.)

This evidence provides sufficient support for the proposition that SKPI not only knew that its film was incorporated into phones which were ultimately imported into the United States, but also that it structured its marketing and sales of polyimide film accordingly. Defendants argue that this evidence does not support· that inference because it does not "link to the accused film." (Defendants' Reply at 10.) This argument is unpersuasive. Song testified that SKPI tracks and monitors its products "to figure out the sales status and the actual use of the items sold." The June 25, 2010 e-mail and Song's testimony assumes that some of its film ends up in United States. The September 2010 Market Performance and Plan has detailed analysis regarding the United States market, from which the jury may reasonably infer that SKPI knew that U.S. market was a downstream market for its film

products and acted accordingly. This is more than sufficient to support a finding that, at least as of June of 2008, SKPI knew its film would be imported into the United States and actively took steps to sell its products with the U.S. market in mind. Direct statements that SKPI knew which exact polyimide film types were incorporated into which phones is not required. See In re Bill of Lading, 681 F.3d 1323, 1336 (Fed.Cir.2012) (proof of indirect infringement may be premised on circumstantial evidence).

### ii. SKPI's Knowledge or Willful Blindness that its Polyimide Film Practiced the '064 and '961 Patents

Having established that SKPI knew its film was being imported into the United States, the Court next addresses whether evidence supports a finding that SKPI knew its film practiced the '064 and '961 Patents. Defendants argued at trial that they had a good-faith belief of non-infringement as to both patents for all relevant time periods. The Court addresses each patent in turn.

Regarding the '064 Patent, as stated previously, the Court will uphold the jury's finding that SKPI had pre-suit knowledge of the '064 Patent as early as August 5, 2004. (See § II.B.2.) In addition to SKPI's knowledge of the patent, substantial evidence supports the inference that SKPI knew it was infringing the patent. SKPI created a "Polyimide Film Training" manual, dated July 9, 2008, which purported to train its employees on polyimide film manufacturing processes and the material properties of the film. (See Trial Exhibit 70 at 2.) Included in the training manual is a depiction of a belt dryer that is copied directly from the Japanese version of the '064 Patent. (Id. at 19.) Further, on March 12, 2010 at an SKPI strategy meet-

ing, the meeting agenda noted a "possibility of patent disputes with competitors when Company earnings are announced." (Trial Exhibit 208 at 2.) SKPI was determined to "prepare a response plan" to those lawsuits, including "review[ing] aggressive response options . . . to allow for negotiation in worst-case scenario." Id. Although this agenda does not reference the '064 Patent specifically, it nonetheless provides a sufficient basis for the jury to infer that SKPI knew its products infringed other companies' patents, including the '064 Patent, because it was preparing to be sued for patent infringement. Taken together, this evidence is more than sufficient to establish SKPI either knew its film infringed the '064 Patent once that film is incorporated into products sold into the United States, or was at the least willfully blind to it.

Regarding the '961 Patent, Defendants' claim of good-faith belief of non-infringement as to the '961 Patent can be separated into two time periods: before and after May 10, 2012. During the pendency of this lawsuit, the ITC conducted an investigation into whether SKPI's polyimide film was made by a process that infringed Kaneka's patents, including the '961 Patent.[23] (See Doc. No. 88.) On May 10, 2012, the ITC concluded that, as to the '961 Patent, Kaneka did not meet its burden on infringement on all but one of SKPI's polyimide film products, a product which SKPI stopped selling approximately one year before the ITC decision issued. (Trial Transcript Nov. 13, 2015, p.m., at 47:18-48:21.) SKPI argued, and SKPI's sales team leader, Keum Soo Song, testified that the ITC decision "confirmed [SKPI's] belief that SKPI did not infringe the patents of Kaneka." (Trial Transcript Nov. 17, 2015, a.m., at 15:11-16.) Relying on this testimony, Defendants argue that they had a good-faith belief of non-infringement of the '961

Patent, at the very latest, after the May 10, 2012 ITC decision. (Defendants' Motion at 20.) However, Defendants also contend that they had a good-faith belief before the ITC decision, pointing to the fact that they have been asserting this belief since the inception of this lawsuit in its pleadings, discovery responses, expert reports, testimony, and argument at the International Trade Commission and in this case. (Defendants' Reply at 12.)

The Court first assesses Defendants' claim that they had a good-faith belief of non-infringement prior to May 10, 2012. As an initial matter, Defendants did not argue or present evidence to the jury that they had a good-faith belief of non-infringement because they have been asserting such a belief since the inception of the lawsuit. More to the point, however, the evidence Defendants did present at trial was not so convincing or conclusive such that it was the only reasonable conclusion that could be drawn from all of the evidence. Callicrate, 427 F.3d at 1366. SKPI designated two witnesses to testify about its good-faith belief of non-infringement of the two patents: Messrs. Young Dong Ahn and Ik San Lee. The testimony of these witnesses was presented to the jury via video-taped deposition. (Trial Transcript, Nov. 17, 2015, a.m., at 47:6-48:1; see Excerpts of Transcript of Lee Dep., Dkt. No. 655-10 and Excerpts of Transcript of Ahn Dep., Dkt. No. 655-11.)

During Ahn's deposition—which was displayed to the jury—he was asked, "how did SKPI form its belief that it did not infringe any of the patents in this case?" to which Ahn replied:

With respect to the SKPI's responses, pursuant to Kaneka's first set of interrogatories in providing the corporate knowledge in that regard, I can confirm to you that such would be contained in

---

**23.** The '064 Patent was not part of the ITC investigation.

experts' report and in their testimony anticipated in the future, and I will appear to testify as to the SKPI's manufacturing processes carried out at the Jincheon plant of SKPI.

(Excerpts of Transcript of Ahn Dep. at 2.) When asked when SKPI formed its belief that it did not infringe the patents in suit, Ahn gave a similar prepared response:

Again, as to the SKPI's corporate knowledge, that would be contained in the responses that was provided by the SKPI pursuant to the first interrogatory requests made by Kaneka and that would also be included in the anticipated expert's report and their testimony.

(Id. at 2-3.) The same is true of Lee. When Lee was asked if SKPI did "anything in order to form a good faith belief that the polyimide film and production processes at the Gumi plant do not infringe the patents in suit," he responded, "It is my understanding that as to the company's positions, those would be reflected in the documents produced already." (Excerpts of Transcript of Lee Dep. at 1-2.) In response to three more questions about SKPI's belief of non-infringement, Lee repeated the same prepared answer—that "the company's positions are contained in the documents." (Id. at 2-3.)

The answers given by Lee and Ahn—witnesses designated to testify about SKPI's belief of non-infringement—were entirely unilluminating and lacked any factual detail. Plaintiff argued to the jury that this testimony should be discredited because the witnesses read rote, prepared statements, and because SKPI did not produce these witnesses for trial. (Trial Transcript, Nov. 18, 2015, a.m., at 27:15-28:16.) The jury was entitled to disbelieve SKPI's witnesses, even if their testimony was uncontradicted. Guy v. City of San Diego, 608 F.3d 582, 588 (9th Cir.2010) ("it has long been held that a jury may properly refuse to credit even uncontradicted testimony");

U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695, 704 (Fed.Cir.1988) ("The jury was not required to accept his expert testimony, even if it was uncontradicted"). And indeed, the Court finds ample reason to do so given the evasive nature of the testimony and the rote statements provided by Mr. Lee and Mr. Ahn in their depositions.

Regarding SKPI's belief of non-infringement after the ITC decision, Mr. Song testified that the decision "confirmed [SKPI's] belief that SKPI did not infringe the patents of Kaneka." (Trial Transcript Nov. 17, 2015, a.m., at 15:11-16.) Significantly, however, neither Lee nor Ahn referenced the May 10, 2012 date as having any significance with regard to SKPI's belief of non-infringement. Moreover, Plaintiff presented evidence to the jury that the ITC decision may have been unfounded, a fact that the jury could infer did not escape SKPI. Notably, Kaneka's infringement expert, Dr. Harris, testified that the quality of the film samples provided by SKPI in the ITC proceeding were "not in very good shape ... they ended up being wrinkled and very torn on the edges. So the data that was obtained from those samples may be somewhat skewed by the fact that the samples they used were not very good samples." (Trial Transcript, Nov. 12, 2015, a.m. at 74:5-18.)

Given that neither Lee nor Ahn referenced the May 10, 2012 date, that Kaneka called into question the soundness of the ITC results, and that the jury was entitled to disbelieve SKPI's witnesses even if their testimony was uncontradicted, the Court is not persuaded that the ITC decision mandates a finding that SKPI had a good-faith belief of non-infringement after May 10, 2012. Rather, in light of the evidence that SKPI had knowledge of the '961 Patent when the suit was filed and nonetheless continued to manufacture its polyimide film using the same processes, the Court

does not find any reason to overturn the jury's finding that SKPI had knowledge of, or was at least willfully blind to, its infringement of the '961 Patent, irrespective of the May 10, 2012 ITC decision. See Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1378 (Fed.Cir.2005) (refusing to disturb a jury's finding of intent to induce infringement, noting that "[i]ntent is a factual determination particularly within the province of the trier of fact").

Accordingly, the Court DENIES Defendants' motion for judgment as a matter of law as to Plaintiff's claims of induced infringement. (Doc. No. 692.)

### III. EQUITABLE DEFENSES

There are two equitable defenses to be decided by the Court. (Defendants' Equitable Defenses Brief at 1.) The first is the defense of implied license, and the second is the defense of laches. The Court addresses each in turn.

### A. Implied License

On December 2, 1993, Kaneka granted Hirano "an exclusive regular license covering the entire scope of the subject patent rights," which included the '064 Patent. (Hirano License at 1, Trial Exhibit 1018, Doc. No. 715-64.) This license permitted Hirano to manufacture and sell polyimide film production equipment, equipment which was made to Kaneka's precise specifications. (Testimony of Mr. Yoshioka, Trial Transcript Nov. 5, 2015, p.m., at 30:19-24 38:22-41:18.) In 2005, SKPI's predecessors purchased this equipment from Hirano and used it to make the polyimide film that is the subject of this lawsuit. (Trial Exhibit 40, Doc. No. 715-8.) Defendants contend that because Kaneka granted Hirano a license to sell equipment which practiced the '064 Patent, SKPI cannot be liable for using that equipment to manufacture its polyimide film. (Defendants' Equitable Defenses Brief at 3.) Kaneka maintains that the license only granted Hirano a right to sell the equipment to non-competitors of Kaneka, not to SKPI's predecessors. (Plaintiff's Equitable Defenses Brief at 10-13.) Defendants pursued two affirmatives defenses in support of this argument: patent exhaustion and implied license.

 The defenses of implied license and patent exhaustion are similar, though not identical. Typically, for accused infringers to succeed on the defense of implied license, they must prove "(1) the patentee [sold] an article that has no non-infringing uses and (2) the circumstances of the sale plainly indicate that the grant of a license should be inferred." Anton/Bauer, Inc. v. PAG, Ltd., 329 F.3d 1343, 1350 (Fed.Cir.2003). However, where, as here, the alleged implied license derives from an express license, "the question whether there is any noninfringing use [is] irrelevant" because the express license "specifically authorized the sale of [the accused devices] for infringing uses." Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc., 522 F.3d 1348, 1361 (Fed.Cir.2008) (citing Jacobs v. Nintendo of America, Inc., 370 F.3d 1097, 1100–01 (Fed.Cir.2004). By contrast, "the patent exhaustion inquiry focuses on a single question: whether or not there was an authorized sale that triggered the exhaustion of the patentee's right." Cornell Univ. v. Hewlett–Packard Co., No. 01–CV–1974, 2008 WL 5671886, at *1 (N.D.N.Y. Aug. 1, 2008) (J. Rader, sitting by designation from the Federal Circuit).

Previously, Defendants moved this Court for an order to bifurcate its patent exhaustion and implied license defenses from the jury trial on the grounds that there is no right to have a jury decide an equitable defense to patent infringement. (See Defendants' Motion to Strike the Jury Demand and Bifurcate the Patent Exhaustion and Implied License Defenses,

Doc. No. 521; see also Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1190 (Fed.Cir.1993) (finding no right exists for a jury to decide the defense of inequitable misconduct).) Neither party disputed that implied license is an equitable defense properly adjudicated by the Court. See Met–Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684 (Fed.Cir. 1986); Wang Labs., Inc. v. Mitsubishi Elecs., 103 F.3d 1571, 1578 (Fed.Cir.1997). However, the Court denied the motion as to the defense of patent exhaustion because it found that patent exhaustion is a legal defense, and as such, is one properly decided by a jury. (See June 25, 2015 Order at 4, Doc. No. 526.) Accordingly, the jury was tasked with finding whether Defendants proved by a preponderance of the evidence that the sale of polyimide film production equipment by Hirano to SKPI and/or its Global Partners, SKC or Kolon, was an authorized sale under the license Kaneka granted to Hirano. (See Verdict, ¶ 17.) The jury found that Defendants did not meet their burden. (Id.)

■ Defendants now move the Court for an order finding that its defense of implied license nonetheless bars Plaintiff's claims. (Defendants' Equitable Defenses Brief at 1.) However, as the Court previously noted, where there is "substantial commonality" between the factual questions presented by legal and equitable claims, a jury's finding of fact pertinent to the legal claim "constrains the court's equitable determination." (See June 25, 2015 Order at 5 fn. 5, citing Cabinet Vision v. Cabnetware, 129 F.3d 595, 600 (Fed.Cir. 1997) ("... the facts underlying [Defendants'] inequitable conduct defense and its [legal] counterclaim possess 'substantial commonality' so that, because the jury answered question 7, the Seventh Amendment constrains the court's equitable determination."). Notably, Defendants do not argue that the defenses of patent exhaustion and implied license do not possess "substantial commonality." Rather, Defendants reiterate arguments made at trial before the jury on its defense of patent exhaustion.[24] (Defendants' Equitable Defenses Brief at 1-5; Defendants Equitable Defenses Reply at 1-10.) Defendants also accuse counsel for Kaneka of making improper and prejudicial statements during closing argument.[25] (Id. at 5-7.)

Undeniably, substantial commonality exists among the factual questions presented by these affirmative defenses. The jury's finding that the Hirano license did not authorized the sale of polyimide film manufacturing equipment to SKPI's predecessors is a factual finding. See Cornell Univ., 2008 WL 5671886, at *1 (recognizing that patent exhaustion "presents a factual question"). This Court cannot now find that the sales were authorized. Therma–Tru Corp. v. Peachtree Doors Inc., 44 F.3d 988, 994–95 (Fed.Cir.1995) ("the court may not make findings in conflict with those of the jury"); see also Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510–11, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (explaining that when equitable claims are joined with legal claims and have factual questions in com-

24. To the extent Defendants' brief is an attempt to challenge the sufficiency of the jury's finding regarding the defense of patent exhaustion, this is not the proper vehicle to make that argument. The Court only addresses here Defendants' defense of implied license and will not analyze whether the jury's verdict as to the defense of patent exhaustion is adequately supported. That argument is best addressed in a renewed motion for judgment as a matter of law, or in the alternative, a motion for new trial. See Fed. R. Civ. P. 50, 59.

25. The Court does not find any of the statements made by counsel for Kaneka during closing argument to be improper or prejudicial. In any event, the Court does not rely on those statements in its analysis of the implied license defense.

mon, the judge's determination of the equitable claims cannot deprive the litigants of their right to a jury trial on factual questions). Accordingly, for purposes of Defendants' implied license defense, the Court adopts the jury's finding that the sales of the equipment to SKPI and/or their Global Partners were not authorized by the license Kaneka granted to Hirano.

Implicit in the jury's finding is that "the circumstances of the sale" do not "plainly indicate that the grant of a license should be inferred." See Anton/Bauer, Inc., 329 F.3d at 1350. The jury was instructed that Kaneka, SKPI, and SKC disputed the meaning of the Hirano license, and that, "[i]n deciding the meaning of the Hirano license, you must decide what the parties intended at the time the contract was created." (Jury Instruction No. 32, Doc. No. 702-1.) Further, the jury was instructed, "[i]n interpreting the Hirano license, you may consider the wording of the contract as well as the intent of the parties and the circumstances leading to the execution of the contract."[26] (Id.) It is reasonable to conclude that the jury did in fact consider the intent of the parties and the circumstances leading to the execution of the contract. This is because the terms of the license granted Hirano "an exclusive regular license covering the entire scope of the subject patent rights," which included the '064 Patent. (Hirano License at 1, Trial Exhibit 1018, Doc. No. 715-64.) On its face, this language unambiguously suggests that Kaneka granted Hirano an exclusive license to sell equipment which practiced the '064 Patent without regard to which customers were permitted to purchase it. However, Kaneka presented evidence at trial demonstrating that, in fact, Hirano knew that the license agreement only permitted it to sell the equipment to customers that did not compete with Kaneka.

Tetsuo Yoshioka, one of the inventors of the '064 Patent, testified that prior to the execution of the license, he was told that Hirano wanted a license so that it could sell to a non-competitor of Kaneka: "if it's not a competitor, then it's okay. It would be okay to sell it. As long as it was being sold and was not going to compete with us, then that would be okay. That was the discussion with Hirano." (Testimony of Mr. Yoshioka, Trial Transcript Nov. 6, 2015, p.m., at 11:10-19; 10:2-5.) Further, Hiroyuki Tsuji of Kaneka testified that Kaneka had a corporate licensing policy to not license to competitors that has existed "throughout" its history and that it was Kaneka's policy to convey this licensing policy to companies who seek licenses from Kaneka. (Testimony of Mr. Tsuji, Trial Transcript, Nov. 4, 2015, p.m., 46:23-47:24.) Given this evidence, it is reasonable to infer that the jury was persuaded that—in 1993—Hirano knew that the license Kaneka granted it did not authorize Hirano to sell polyimide film equipment to Kaneka's competitors, of which SKPI's predecessors indisputably were. The Court would come to the same conclusion. As such, the Court finds that "the circumstances of the sale" of polyimide film manufacturing equipment from Hirano to SKPI do not "plainly indicate that the grant of a license should be inferred." See Anton/Bauer, Inc., 329 F.3d at 1350.

The Court therefore FINDS that the defense of implied license does not bar Plaintiff's claims.

### B. Laches

■ The Patent Act does not provide a statute of limitations for infringe-

---

**26.** The license was a contract executed in Japan, and as such, Japanese law governs its interpretation. (See MSJ Order at 12.) Under Japanese law, a court would consider extrinsic evidence to interpret a contract, even if a contract provision appears unambiguous. (Id. at 13.)

ment claims. However, it is well-established law that the equitable doctrine of laches may bar a patentee's recovery where: (1) the patentee knew of his claim, but unreasonably delayed in filing suit; and (2) that delay caused material prejudice to the alleged infringer. See Hair v. United States, 350 F.3d 1253, 1257 (Fed.Cir.2003) ("Even without a specific statutory bar to call into play, courts will impose a parallel bar—under the rubric of laches—in cases in which the plaintiff has failed to act in a reasonably prudent manner to protect and enforce rights, and when a perceived injustice to the defendant exists."). With respect to the first requirement—knowledge of infringement coupled with unreasonable delay in pursing claims against said infringement—the Federal Circuit has held that "[t]he length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed.Cir.1992). "The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit. However, the period does not begin prior to issuance of the patent." Id. (citations omitted); see also Wanlass v. GE, 148 F.3d 1334, 1337 (Fed.Cir.1998) ("[t]he period of delay begins at the time the patentee has actual or constructive knowledge of the defendant's potentially infringing activities"). A presumption of laches arises in patent infringement actions where the patentee delayed bringing suit for at least six years from the time the patentee had actual or constructive knowledge of infringing activity. A.C. Auckerman Co., 960 F.2d at 1034–35.

Defendants assert that "[s]ince 2003, Kaneka knew Hirano would be providing polyimide film manufacturing equip-ment to at least one of SKPI's predecessors, and that the equipment would be like the equipment Hirano provided to Kaneka." (Defendants' Equitable Defenses Brief at 7.) Defendants also point to a 2004 sales meeting conducted by Kaneka for the proposition that Kaneka was aware in 2004 of SKC's [27] operation of a pilot line and Kolon's efforts to assemble a mass production line. (Id.; Trial Exhibit 155, p. 20.) Kaneka admits that it had actual or constructive knowledge of infringing activity of the '064 Patent in 2006—four years before bringing suit—when SKC was in the process of trials of commercial production of polyimide film and awaiting customer evaluation of its samples. (Plaintiff's Equitable Defenses Brief at 21; see also Trial Transcript Nov. 4, 2015, p.m., at 7:6-20.) However, Kaneka disputes Defendants' contention that it had actual or constructive knowledge prior to 2006. (Id. at 22.)

The Court finds that the presumption of laches does not apply. The contention that in 2003, Kaneka was aware that, at some point in the future, Hirano would be providing polyimide film manufacturing equipment to one of SKPI's predecessors does not indicate that any infringement was in fact happening in 2003 or that Kaneka was aware of such. The sale had not been completed, and there is no allegation that any polyimide film was produced on this equipment by SKPI's predecessor in 2003. Further, that Kaneka was aware in 2004 of efforts by Kolon to begin assembly of a mass production line of polyimide film and by SKC to operate a pilot line of polyimide film does not prove that Kaneka knew its '064 Patent was being infringed. Infringement of the '064 Patent requires sales or production of the patented product within the United States. Power Inte-

---

**27.** The reference to SKC in this instance is to one of SKPI's predecessors, not to the Defen- dant SKC, Inc., which is an American compa-ny.

grations, Inc., 711 F.3d at 1371. There is no evidence that this film was being sold anywhere, much less in the United States. Accordingly, the Court finds that the earliest Kaneka knew of Defendants' infringing activity was in 2006—four years prior to the commencement of this lawsuit—when SKC began shipping polyimide film to its customers for evaluation.

Although the presumption of laches does not apply, "[e]limination of the presumption does not mean the patentee precludes the possibility of a laches defense; it does mean, however, that the presumption of laches plays no role in the ultimate decision." A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1038 (Fed.Cir.1992). "The facts of unreasonable delay and prejudice then must be proved and judged on the totality of the evidence presented." Id. Regarding prejudice, Defendants argue that they invested in additional production lines which they otherwise would not have purchased had Kaneka initiated this lawsuit earlier. (Defendants' Equitable Defenses Brief at 11.) However, this claim is unsupported by any evidence in the record. Rather, in light of Defendants' affirmative defense of good-faith belief of non-infringement, it seems more likely that Defendants would not have changed their sales strategy during the pendency of the litigation had it begun earlier. (See Defendants' Memorandum of Contentions of Fact and Law at 25, "There is, however, significant evidence on SKPI's good-faith belief that Plaintiff's patents were not infringed and indications that SKPI's good-faith belief was reasonable and correct," Doc. No. 563.) Further, Kaneka's delay in bringing suit was not so unreasonable as to preclude them from any relief. The Court therefore FINDS that the defense of laches does not bar Plaintiff's claims.

## IV. KANEKA'S MOTION FOR ENTRY OF JUDGMENT, SUPPLEMENTAL DAMAGES, ACCOUNTING, AND PRE-AND POST-JUDGMENT INTEREST

The parties raise several issues regarding Kaneka's Proposed Judgment and requests for supplemental damages: whether the judgment should reflect sub-categories of each type of polyimide film the jury found infringed Kaneka's patents; whether the jury's verdict supports an entry of judgment as to Plaintiff's induced infringement claim; whether Kaneka is entitled to a reasonable royalty on its direct infringement claims against SKC notwithstanding the fact that the jury did not award Kaneka a royalty on those claims; whether Kaneka is entitled to an accounting at this time; and whether Kaneka is entitled to pre– and/or post-judgment interest on the damages award. (See generally Plaintiff's Motion and Defendants' Opposition.) The Court addresses each issue in turn.

### A. Plaintiff's Proposed Judgment

Kaneka submitted a proposed judgment in support of its motion which it contends is consistent with the jury's verdict, except that Kaneka also seeks a reasonable royalty for SKC's infringement of the '064 and '961 Patents. (Proposed Judgment, Doc. No. 669-2.) Defendants argue that the verdict and the judgment are too broad because they fail to break down each "type" of polyimide film into sub-categorical samples or "versions." This failure, they argue, caused the verdict form and Proposed Judgment to encompass versions of SKPI's polyimide film that the Court found did not infringe Kaneka's patents and versions which Kaneka's infringement expert testified did not infringe the patents. (Defendants' Opposition at 11-15.) Defendants also argue that the special verdict form submitted to the jury was fundamentally flawed, which resulted in the failure of the jury's verdict to contain the

findings "necessary" to conclude that Samsung or LG directly infringed Kaneka's patents. (Id. at 5-11.) Finally, Defendants dispute Kaneka's contention that it is entitled to a reasonable royalty for SKC's infringement of the '064 and '961 Patents. (Id. at 15-17.)

### 1. The Judgment Need Only Identify Products, Not Individual Samples

Defendants argue that the judgment needs to list each "version" of each "type" of polyimide film. (Defendants' Opposition at 11-15.) The judgment proposed by Plaintiff—which is consistent with the format of the jury's verdict—identifies SKPI's polyimide film by the "type" of film produced, or the name of each of SKPI's accused products. (Compare Verdict ¶¶ 2, 3, 7, 10, 12 with Proposed Judgment ¶¶ 1-7.) Defendants argue that each "type" of film should be broken down into sub-categorical "versions" of film. This is because, although the jury found each "type" of SKPI's film infringed Kaneka's patents, a sub-categorical "version" of that same "type" of film was found either by the Court or by Kaneka's infringement expert, Dr. Harris, not to infringe some claims of the patents in suit. (See MSJ Order at 17; Testimony of Dr. Harris, Nov. 12, 2015, a.m., at 28:1-5.) As an example, the jury found SKPI's LN 050 (12.5 $\mu$m) infringed all asserted claims of the '961 Patent. (Verdict ¶ 12.) SKPI provided Kaneka four different samples of this film to test, designated ITC-01, ITC-13, ITC-24, and CDCA-34. (Defendants' Opposition, Exhibit C at 2.) At summary judgment, Dr. Harris did not perform an infringement analysis on certain samples, and as such, this Court found that sample ITC-24 does not infringe claims 2 and 9 and that sample CDCA-34 does not infringe claim 2. (MSJ Order at 17.) For this reason, Defendants argue that by listing only LN 050 (12.5 $\mu$m) and not each of the four samples, the jury's verdict is too broad and encompasses films that do not infringe Kaneka's patents. (Defendants' Opposition at 14.)

Defendants are incorrect. What they label as "versions" are, in actuality, the names of specific samples of the products SKPI gave Kaneka to test. (See Testimony of Mr. Song, Nov. 17, 2015 Trial Transcript at 26:1-27:22, Doc. No. 686.) For each polyimide film product accused to infringe Kaneka's patents, SKPI gave Kaneka one or more samples of that product, each of which had a unique identifier. (See Defendants' Opposition, Exhibit C.) The evidence presented at trial established that the samples SKPI provided were *representative* of the products generally *without regard* to versions. Mr. Song, SKPI's sales team leader and the individual that provided Plaintiff with the samples, testified that the versions of polyimide film produced to Kaneka "are representative samples of our products." (See Testimony of Mr. Song, Nov. 17, 2015 Trial Transcript at 26:1-27:22.) Dr. Sue Mecham, Defendants' expert on infringement, confirmed as much, testifying that she understood that Kaneka's expert "was provided with all the rolls available" from SKPI and that SKPI "was asked to provide representative products and that's what they did." (Testimony of Dr. Mecham, Nov. 12, 2015, p.m. session, at 67:24-69:21.) This is further confirmed by SKPI's sales records, which only indicate product names, i.e. the "type" of film, and do not differentiate between samples or "versions." (See Trial Exhibits 53-61.)

██ A patentee can prove infringement by showing that just "some samples" or even "a sample" of the product is found to meet all the limitations of a patent's claims. Grain Processing Corp. v. American Maize–Products, Co., 840 F.2d 902, 911 (Fed.Cir.1988). This is precisely what Kaneka did. (Compare Trial Exhibits 147, 148 with Verdict ¶¶ 2, 3, 7, 10, 12.) Accordingly, the polyimide film types as listed in

Kaneka's proposed judgment are proper, and the judgment need not reference each individual sample. (See Proposed Judgment ¶¶ 1-7.)

### 2. The Verdict Supports a Judgment against SKPI on Induced Infringement

Defendants also argue that the verdict form precluded the jury from making a specific finding that either SKC, Samsung, or LG directly infringed Kaneka's patents—an essential element to the induced infringement claims against SKPI. (Defendants' Opposition at 7-8.) As discussed above, this argument is meritless. (See supra § II.B.) The jury's verdict supports a judgement against SKPI on induced infringement as to both the '064 and '061 Patents.

### 3. Reasonable Royalty for SKC's Direct Infringement

██ Although the jury found that SKC directly infringed both the '064 and '961 Patents, (Verdict ¶¶ 1-3), the jury awarded Kaneka zero royalty damages for that infringement, (id. ¶¶ 18, 21).[28] Notwithstanding the jury's verdict, Kaneka requests that the Court award a ten percent royalty for SKC's direct infringement. (Plaintiff's Motion at 6.) Plaintiff argues that even though the jury awarded zero damages for SKC's direct infringement, it nonetheless is entitled to a reasonable royalty pursuant to 35 U.S.C. § 284, which states:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the

invention by the infringer, together with interest and costs as fixed by the court. When the damages are not found by a jury, the court shall assess them.

35 U.S.C. § 284. Defendants argue that, notwithstanding § 284, the Court should not disturb the jury's award of zero dollars for SKC's direct infringement because to do so would be a violation of the Seventh Amendment. (Defendants' Opposition at 15.) Alternatively, Defendants argue the record lacks any evidence upon which to base a royalty award. (Id. at 16.)

The Reexamination Clause of the Seventh Amendment states that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of common law." U.S. Const. amend. VII; see also Minks v. Polaris Indus., Inc., 546 F.3d 1364, 1370 (Fed.Cir.2008). Here, Kaneka's alleged damages from SKC's direct infringement *was* tried to the jury. Kaneka presented its evidence to the jury, and the jury found that Kaneka had not proven that it is entitled to a reasonable royalty. (Verdict ¶¶ 18, 21.) It may be the case that the jury's finding of zero damages cannot be squared with § 284. See Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1333 (Fed. Cir.2004) (noting that "[t]he jury's finding of no damages cannot be supported" because § 284 "requires that damages to a successful claimant in a patent infringement suit shall not be less than a reasonable royalty"). Even so, that does not mean that the Court can make a post hoc finding of a reasonable royalty that conflicts with the jury's verdict.[29] See Quaker City Gear Works, Inc. v. Skil Corp., 747

---

**28.** Kaneka did not seek lost profits for SKC's direct infringement.

**29.** The Court notes that none of the cases cited by Kaneka in support of its request for a ten percent royalty involve a jury verdict that was subsequently altered by a district court. Both Apple, Inc. v. Motorola, Inc., 757 F.3d

1286, 1327 (Fed.Cir.2014) (overruled on other grounds by Williamson v. Citrix Online, LLC, 792 F.3d 1339 (Fed.Cir.2015)) and Info–Hold, Inc. v. Muzak LLC, 783 F.3d 1365, 1372 (Fed.Cir.2015) were appeals from summary judgment orders. In two other cases, the district court below had acted as a factfinder

F.2d 1446, 1453 (Fed.Cir.1984) ("we do not agree that [after the jury rendered its verdict] the court was free to make a specific finding under Rule 49(a) which *overruled* an implicit and inherent finding of the jury within a broader question. Rather, the court had to accept the jury's determination and could set it aside only if it were not supported by substantial evidence"); see also LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 81 (Fed.Cir.2012) (remanding for a new trial on damages where the jury's award of a reasonable royalty "was arbitrary and speculative").

Because Kaneka's request for a reasonable royalty violates the Reexamination Clause of the Seventh Amendment, it is DENIED. See Boston Scientific Corp. v. Johnson & Johnson, 550 F.Supp.2d 1102, 1122 (N.D.Cal.2008) ("Even if there were evidence sufficient for the Court, as opposed to the jury, to determine a reasonable royalty, doing so at this point [after the jury has rendered its verdict] would violate [the plaintiff's] Seventh Amendment rights, and the statutory language [of § 284] cannot override the requirements of the Constitution.").

■■■■ However, Kaneka may bring a motion for judgment notwithstanding the verdict on this issue, or in the alternative,

a motion for new trial. Defendants argue that Kaneka waived its right to challenge the jury's verdict of zero royalty damages because Kaneka failed to move the Court for a directed verdict on the issue under Rule 50(a). (Defendants' Opposition at 17.) The Court disagrees. In patent cases, the law of the regional circuit governs the grant or denial of a motion for judgment as a matter of law. Summit Tech. Inc. v. Nidek Co., 363 F.3d 1219, 1223 (Fed.Cir. 2004). In the Ninth Circuit, there is a recognized exception to the Rule 50(b) requirement that a party first move for a directed verdict under Rule 50(a). "[A] motion for directed verdict need not be a condition precedent for a motion for JNOV when the challenge is to the consistency of the answers under a Rule 49(a) special verdict." Pierce v. S. Pac. Transp. Co., 823 F.2d 1366, 1369 (9th Cir.1987); see also Guy v. City of San Diego, 608 F.3d 582, 586 (9th Cir.2010). Here, Kaneka's challenge to the jury's verdict is that the verdict's answers are inconsistent, namely that the jury's finding that SKC directly infringed the patents in suit is inconsistent with its finding of zero damages. (Plaintiff's Motion at 7; Plaintiff's Reply at 3.)

Accordingly, the <u>Pierce</u> exception applies, and Kaneka may move for judgment notwithstanding the verdict as to damages for SKC's direct infringement.[30] Alterna-

during a court trial. See Dow Chemical Co. v. Mee Indus., Inc., 341 F.3d 1370, 1381 (Fed. Cir.2003) (reversing a district court's finding of zero damages after a court trial); Lindemann Maschinefabrik GmbH v. American Hoist & Derrick Co., 895 F.2d 1403, 1404 (Fed.Cir.1990) (after a court trial on infringement, district court found patent invalid; Federal Circuit reversed; on remand, court awarded patentee a reasonable royalty; Federal Circuit affirmed the award). Because the district court had acted as a factfinder in the first instance in those cases, the Federal Circuit's discussion regarding the court's duties under § 284 are materially different from this Court's responsibility to enter judgment consistent with the jury's verdict. Finally, in Nori-

an Corp., the jury found that "if the [patent-in-suit] were valid no damages are payable." 363 F.3d at 1325. The Federal Circuit noted that this finding was not supported by § 284, but the issue was moot because the patent was not valid. Id. at 1333. On remand, the Federal Circuit directed the district court to ascertain a reasonable royalty for a different patent—one disposed of on summary judgment. Id. Accordingly, Norian Corp. does not support Kaneka's request that the Court make a factual finding post-verdict regarding a reasonable royalty.

**30.** At the hearing on this issue, Defendants cited DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1335 (Fed.Cir.

tively, Kaneka may also move for a new trial on damages. See LaserDynamics, 694 F.3d at 81; see also Uniloc USA, Inc. v. Microsoft, 632 F.3d 1292, 1321 (Fed.Cir.2011) (affirming a district court's grant of a new trial on reasonable royalty damages where the jury's calculation was improper). However, Kaneka is cautioned that in considering jury answers to questions in a special verdict, it is the duty of the Court to attempt to harmonize the answers, if possible under a fair reading of them.[31] Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963). If Kaneka wishes to move for judgment as a matter of law on this issue, or in the alternative, for a new trial, it must do so within 28 days after judgment is entered. See Fed. R. Civ. P. 50(b), 59(b).

## B. Kaneka is Entitled to an Accounting for Supplemental Damages

■ Kaneka submits that it is entitled to supplemental damages for any infringing sales made by SKPI in the period after SKPI made its final disclosure of sales figures to Kaneka and before the jury entered its verdict. (Plaintiff's Motion at 2.) Kaneka also seeks supplemental damages for SKPI's sales of infringing products occurring during the period between the jury's verdict and the entry of judgment. (Id. at 5.) Defendants argue that these requests for accounting are premature because once judgment is entered, they intend to present additional post-trial motions that will affect any potential accounting. (Defendants' Opposition at 18.)

Alternatively, Defendants request that any accounting should be stayed pending final resolution of all post-trial motions. (Id. at 19.)

■ "District courts have discretion to award damages for periods of infringement not considered by the jury." Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 38 (Fed.Cir.2012); see also 35 U.S.C. § 284 ("When the damages are not found by a jury, the court shall assess them." The Federal Circuit has noted that a patentee is not "fully compensated" unless the damages award includes sales of infringing product following the verdict. Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1212–13 (Fed.Cir.2010); see also Whitserve, LLC v. Computer Packages, Inc., 694 F.3d 10, 38 (Fed.Cir.2012) ("the trial court abused its discretion when it failed to award, or explain its reasons for denying, damages for the period between the jury's verdict and judgment").

The '064 Patent expired in March 2010. (Testimony of Mr. Napper, Trial Transcript Nov. 10, 2015, p.m., 82:17-19.) Accordingly, Kaneka is not entitled to any supplemental lost profits damages for the '064 Patent. However, the '961 Patent is still valid. The evidence presented at trial in support of Kaneka's lost profits came in through Brian Napper, Kaneka's damages expert. Mr. Napper relied upon SKPI's financial and sales documents. The most recent sales figures provided by SKPI to Kaneka reported sales through

2009) for the proposition that Kaneka has waived its right to challenge the jury's verdict on damages for SKC's infringement. (Transcript of March 3, 2016 Hearing at 25, Doc. No. 721.) However, DePuy is distinguishable because the district court in that case sat in the First Circuit. Under First Circuit jurisprudence, any inconsistency in the jury's verdict has to be raised before the jury is discharged, or the objection is waived. Wennik v. Polygram Group Distrib., Inc., 304 F.3d 123, 130

(1st Cir.2002) (setting forth the First Circuit's "iron-clad rule that a party 'waives [the issue of] inconsistency if it fails to object after the verdict is read and before the jury is dismissed.' "). This is not the law of the Ninth Circuit. See Pierce, 823 F.2d at 1369. Accordingly, DePuy does not control here.

31. The Court makes no determination at this time whether the jury's findings are inherently inconsistent.

June 30, 2015, the end of the second fiscal quarter. (See Trial. Exhibit 61 at 1-6, 53.) The jury rendered its verdict on November 19, 2015. (See Verdict.) Thus, the jury did not award Kaneka lost profits for the full period of SKPI's infringement of the '961 Patent. (See Testimony of Mr. Napper, Trial Transcript Nov. 10, 2015, p.m., 96:18-97:1.)

Because the jury found that SKPI induced infringement of the '961 Patent, and because the jury found that Kaneka is entitled to an award of lost profits for SKPI's infringement, the Court FINDS that an accounting of SKPI's sales of products found to infringe the '961 Patent from July 1, 2015 through the date of the verdict, November 19, 2015, is appropriate. See Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd., 833 F.Supp.2d 333, 351 (E.D.N.Y.2011) (awarding an accounting of infringing sales for the time period subsequent to that considered by the jury up to the date of the verdict). Further, the Court FINDS that an accounting of sales of any infringing product sold by SKPI from the date of the verdict to the date judgment is entered is also appropriate. See Fresenius USA, Inc. v. Baxter Int'l, Inc., 582 F.3d 1288, 1303 (Fed.Cir.2009) ("[a] damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales of [the infringing product]"). However, the Court will STAY the accounting until final resolution of all post-trial motions.

### C. Pre-Judgment Interest

In patent litigation, prejudgment interest on a damages award is awarded pursuant to 35 U.S.C. § 284, which states, in part, "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." The U.S. Supreme Court has interpreted section 284 as follows:

> In light of [Congress' overriding purpose of affording patent owners complete compensation], we conclude that prejudgment interest should ordinarily be awarded. In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the foregone use of the money between the time of infringement and the date of the judgment.

General Motors Corp. v. Devex Corp., 461 U.S. 648, 655-56, 103, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). Further, the Supreme Court has held "that prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." Id. at 657, 103 S.Ct. 2058. In General Motors, the Court gave an example of where it "may be appropriate to limit prejudgment interest, or perhaps even deny it altogether": "where the patent owner has been responsible for undue delay in prosecuting the lawsuit." Id.

 "Unlike post-judgment interest for which the interest rate is set by statute, there is no mandatory interest rate and no standard rate for calculating an award of prejudgment interest." TiVo, Inc. v. Echostar Communications Corp., No. 2:04-CV-1-DF, 2006 U.S. Dist. LEXIS 64291, at *5 (E.D.Tex. Aug. 17, 2006). Rather, a trial court is afforded "wide latitude" in selecting a prejudgment interest rate. Uniroyal, Inc. v. Rudkin–Wiley Corp., 939 F.2d 1540, 1545 (Fed.Cir.1991). Thus,

while courts have selected different rates, courts most often award either the prime rate or the U.S. Treasury rate. TiVo, Inc., 2006 U.S. Dist. LEXIS 64291, at *6 (collecting cases). Lastly, prejudgment interest generally "should be awarded from the date of infringement to the date of judgment." Nickson Indus., Inc. v. Rol Mfg. Co., Ltd., 847 F.2d 795, 800 (Fed.Cir.1988) (citing General Motors Corp., 461 U.S. at 656, 103 S.Ct. 2058).

Kaneka seeks an award of pre-judgment interest calculated at the prime rate and compounded quarterly for the damages award for infringing sales throughout the applicable periods and continuing until the date judgment is entered. (Plaintiff's Motion at 10.) Defendants request the Court deny Kaneka any pre-judgment interest because Kaneka unfairly delayed in filing suit, which caused damages to escalate. (Defendants' Opposition at 19.) Alternatively, Defendants request that pre-judgment interest should not be awarded for at least the time period while the case was stayed pending the related ITC investigation, an action that Kaneka initiated, and should be awarded at the Treasury bill rate, compounded annually. (Id. at 19-20.)

### 1. The '064 Patent

■ Kaneka admits that it knew of a possible claim for infringement against Defendants for the '064 Patent "at most" four years·prior to filing suit. (Plaintiff's Equitable Defenses Brief[32] at 23.) Kaneka offers no compelling explanation for why, after it was aware of a possible claim for infringement, it waited four years to file suit. Rather, Kaneka contends that Defendants were not prejudiced by the delay because they would have continued to infringe the patent irrespective of the lawsuit. (Id. at 24.) Although this argument is

persuasive, the Court nonetheless notes that the relevant damages periods could have been markedly different had Kaneka filed suit when it was first aware of a possible claim for infringement, regardless of whether Defendants would have continued to infringe the patent. The four-year delay in initiating the present suit therefore likely caused damages owed by Defendants to escalate. Conveniently, Kaneka filed the instant litigation four months after the '064 Patent expired. (Compare Complaint, filed July 26, 2010, Doc. No. 1, with Testimony of Mr. Napper, Trial Transcript Nov. 10, 2015, p.m., 82:17-19, stating that the '064 Patent expired in March of 2010.)

Although the Court finds that Kaneka's delay was not so unreasonable as to deny all relief to Kaneka, see supra III.B., the Court is persuaded that this four-year delay caused the damages owed by Defendants to escalate. Accordingly, the Court finds that the delay resulted in prejudice to Defendants and on that ground DENIES Plaintiff's request for prejudgment interest for damages awarded for infringement of the '064 Patent. See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1362 (Fed.Cir. 2001) (affirming a district court's denial of prejudgment interest where the plaintiff delayed two years in filing suit and where the delay was self-serving and resulted in prejudice to the defendants).

### 2. The '961 Patent

■ Regarding the '961 Patent, there is no allegation that Kaneka delayed bringing suit; nor could there be—the '961 Patent issued on April 6, 2010. (SAC ¶ 40.) Accordingly, the Court will assess prejudgment interest for damages awarded for

---

**32.** Both parties refer the Court to their respective arguments regarding the equitable defense of laches in support of and in opposition to Defendants' claim that Kaneka should

be denied pre-judgment interest on the grounds that it unreasonably delayed filing suit. (Defendants' Opposition at 19; Plaintiff's Reply at 12.)

infringement of the '961 Patent. However, such interest shall not include the period of time litigation was stayed pending the investigation by the International Trade Commission, an action Kaneka initiated. Kaneka did not oppose the stay of proceedings as to the '961 Patent pending the investigation. (See July 11, 2011 Order Granting Stay of Proceedings, Doc. No. 88.) As such, no prejudgment interest on damages for the '961 Patent shall be awarded from July 11, 2011 to December 10, 2012, the date the stay was lifted, (Doc. No. 117). See Uniroyal, Inc. v. Rudkin–Wiley Corp., 939 F.2d 1540, 1546 (Fed.Cir. 1991) (affirming a district court's denial of prejudgment interest for the period of time when proceedings were stayed upon mutual agreement of the parties).

As to the rate to be assessed, the Court is persuaded that the interest which more fully compensates Plaintiff for its loss is the prime rate. See Server Tech., Inc. v. Am. Power Conversion Corp., No. 3:06–CV–00698–LRH–VP, 2015 WL 1505654, at *6 (D.Nev. Mar. 31, 2015) ("In contrast to the Prime rate, the court finds that [defendant's] proposed Treasury Bill rate would not cover inflation over the infringing period. Moreover, in the context of patent infringement, the Treasury Bill rate is often inappropriate, as its lower rate of return has the potential to result in a windfall profit for the infringer.") citing Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., 2009 WL 920300, at *2 (D.Ariz.2009). As Judge Richard Posner has stated:

> For the future, we suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate. That is a readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default. The defendant who has violat-

ed the plaintiff's rights is in effect a debtor of the plaintiff until the judgment is entered and paid or otherwise collected. At any time before actual payment or collection of the judgment the defendant may default and the plaintiff come up empty-handed. The plaintiff is an unsecured, uninsured creditor, and the risk of default must be considered in deciding what a compensatory rate of interest would be.

Gorenstein Enters., Inc. v. Quality Care–USA, Inc., 874 F.2d 431, 436–37 (7th Cir. 1989) (Posner, J.); see also Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc., 862 F.2d 1564, 1579–80 (Fed.Cir.1988) (a patentee need not offer proof of borrowing at or above the prime rate "to be entitled to an award of prejudgment in interest at the prime rate").

As to the appropriateness of compounding the interest, courts "have recognized that compounding is necessary to fully compensate the patentee." Apple, Inc. v. Samsung Elecs. Co., 67 F.Supp.3d 1100, 1122 (N.D.Cal.2014); citing Sealant Sys. Int'l, Inc. v. TEK Global S.R.L., No. 5:11–CV–00774–PSG, 2014 WL 1008183, at *6 (N.D.Cal. Mar. 7, 2014). "Because a patentee's damages include the foregone use of money, compounding is needed to account for the time value of money." AMP Inc. v. Lantrans, Inc., No. CV 90–1525–DWW (JRX), 1991 WL 253796, at *8 (C.D.Cal. Nov. 7, 1991). Kaneka has not demonstrated why compounding quarterly is more appropriate than any other manner of compounding, but simply cited cases in which other courts have compounded prejudgment interest quarterly. (Plaintiff's Motion at 9-10.) The Court is satisfied that compounding the prime interest rate annually will adequately compensate Kaneka for its loss. See Open Text S.A. v. Box, Inc., No. 13–CV–04910–JD, 2015 WL 4940798, at *12 (N.D.Cal. Aug. 19, 2015)

(compounding prime rate annually in a patent dispute); AMP Inc., 1991 WL 253796, at *8 (same); Apple, Inc., 67 F.Supp.3d at 1122 (compounding T-Bill rate annually). Therefore, prejudgment interest on damages awarded for infringement of the '961 Patent shall be awarded at the prime rate, compounded annually, from the date of infringement until the date judgment is entered, excluding the time litigation was stayed pending the ITC investigation.

### D. Post-Judgment Interest

Under the post-judgment statute, 28 U.S.C. § 1961, post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court...." Section 1961 further provides that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961. The Supreme Court has stated that "[t]he purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835–36, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (internal quotations and citation omitted). The Federal Circuit defers to the relevant circuit for interpretation of the post-judgment statute. Transmatic Inc. v. Gulton Indus. Inc., 180 F.3d 1343, 1347–48 (Fed.Cir.1999). The Ninth Circuit has held that the award of post-judgment interest is mandatory. Barnard v. Theobald, 721 F.3d 1069, 1078 (9th Cir.2013).

Defendant does not dispute that if judgment is entered in favor of Kaneka, Kaneka is entitled to an award of post-judgment interest. Because judgment will be entered in Kaneka's favor, the Court GRANTS Kaneka's request for an award of post-judgment interest. The Court FINDS that Kaneka is entitled to post-judgment interest, calculated in the manner set forth in 28 U.S.C. § 1961(a).

### E. Remaining Issues

Defendants also take issue with some of the tenses and phrasing used in Plaintiff's proposed judgment. Specifically, Defendants argue that "[p]roducts cannot infringe a patent." (Defendants' Opposition at 4.) Rather, they contend, it is only the "action" of making, using, offering to sell, selling or importing into the United States a product covered by a patent that leads to infringement of that patent. (Id.) This is a minor issue which the parties should be able to resolve. Defendants also take issue with the statement in the proposed judgment that SKPI products presently "infringe" the '064 Patent. That patent is expired, and as such, "infringe" should be in the past tense. (Id. at 5.) Kaneka recognizes this error. (Plaintiff's Reply at 2, fn. 1.) The parties are directed to meet and confer on these issues to come up with a mutually agreeable solution that is consistent with the jury's verdict.

### V. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion for judgment as a matter of law as to Plaintiff's claims of induced infringement. (Doc. No. 692.) The Court FINDS that the equitable defenses of implied license and laches do not bar Plaintiff's claims. (Doc. Nos. 654, 698.) And the Court GRANTS IN PART Plaintiff's Motion for Entry of Judgment, an Award of Supplemental Damages, an Accounting of Infringing Sales, and Pre-Judgment and Post-Judgment Interest. (Doc. No. 669.)

The Court ORDERS Kaneka to submit an amended proposed judgment in accordance with this Order by **August 19, 2016.** Defendants may lodge any objection to that proposed judgment by **August 26, 2016.** The Court will enter judgment thereafter.

**IT IS SO ORDERED.**